GTFM, INC. and GTFM, LLC, Plaintiffs,

v.

SOLID CLOTHING INC., d/b/a ZAM, Defendant.

No. 01 Civ. 2629(DLC).

United States District Court, S.D. New York.

July 11, 2002.

Louis S. Ederer, John Maltby, Joseph P. Tucker, Gursky & Ederer, LLP, New York City, for Plaintiffs.

Mark L. Sutton, John Park, Benjamin Jesudasson, Los Angeles, CA, for Defendant.

## OPINION AND ORDER

COTE, District Judge.

At this non-jury trial, the plaintiffs assert that their two digit number—"05"—functions as a trademark when placed on clothing, principally athletic jerseys, sold to young men. Plaintiffs GTFM, Inc. and GTFM, LLC (collectively, "GTFM") are the owner and master licensee, respectively, of the federally registered trademarks "FUBU," "FUBU 05" and "05" for International Class 25 (Clothing). GTFM designs, manufactures and sells clothing primarily to young males, marketing its products by identification with urban American "hip-hop" culture and celebrities from the sports and music worlds. In less than a decade, its sales have exploded to hundreds of millions of dollars a year. Its designs and success have spawned imitation and this trial is on claims brought against one of its imitators.

GTFM brought this action against defendant Solid Clothing Inc. ("Solid") for Solid's infringement of GTFM's "05" mark. Between 1999 and 2001, Solid used "05" and then "PLAYERS 05" on sports apparel it designed to imitate GTFM's wildly popular garments. GTFM has sued Solid for willful trademark and trade dress infringement, counterfeiting and dilution, and false designation of origin under the Trademark Act of 1946 ("Lanham Act" or the "Act"), 15 U.S.C. 1051 *et seq.*, common law trademark infringement and unfair competition, and the violation of New York General Business Law Sections 360–*l* and 349. Solid, which has applied to register

its own trademark—"PLAYERS 05"—for the clothing it sells that is based on plaintiffs' designs and trademarks, seeks through a counterclaim to cancel GTFM's registration of the "05" trademark pursuant to Section 37 of the Act, 15 U.S.C. § 1119.

GTFM filed this action on March 28, 2001, and filed an amended complaint on April 2, 2002. A bench trial was held on July 1 and 2, 2002. As noted, the trial principally concerned GTFM's claims that Solid had infringed its "05" trademark, as well as the trade dress of its football and baseball jerseys. Solid relied primarily on its assertions that GTFM's registration of the "05" mark had been obtained through fraud, that the "05" mark is functional, that the "05" mark and trade dress are not distinctive, that there was in any event no confusion because many of Solid's "05" garments also had the word "Players" on the garment along with other distinguishing features, and that it had not engaged in any willful misconduct.

In accordance with the Individual Practices of this Court in civil bench trials, and without objection, the parties submitted the direct testimony of their witnesses by affidavit as well as their documentary evidence in advance of trial. Plaintiffs submitted the affidavits of Daymond John ("John"), GTFM's chief designer and the co-founder and Chief Executive Officer of Fubu The Collection, LLC, which is a shareholder of GTFM, Inc. and a member of GTFM, LLC; Bruce Weisfeld ("Weisfeld"), President of GTFM, Inc. and GTFM, LLC; Norman Weisfeld, Secretary and Treasurer of GTFM, Inc. and GTFM, LLC; Joseph Nadav ("Nadav"), President of City Blue, Inc., a chain of clothing stores; Kris Buckner ("Buckner"), a private investigator; Noe Bermudez ("Bermudez"), a private investigator; Lauren Dienes ("Dienes"), a former associate at Gursky & Ederer, LLP, plaintiffs'

counsel; David Jones ("Jones"), a paralegal at Gursky & Ederer; and Ken Weprin ("Weprin"), a sportscaster. Plaintiffs also relied on excerpts from the deposition testimony of Sang P. Park ("Park"), President of Solid; Wha Jung Kim ("Kim"), Secretary of Solid; Diane Choi ("Choi"), an administrative assistant at Solid; and Chong Roh ("Roh"), a paralegal at Park & Sutton, LLP, defendant's trial counsel.

Defendant submitted the affidavits of Park, Kim, Roh, and Marian Golub ("Golub"), a secretary at Silver & Silver, LLP, defendant's local counsel. Defendant also relied on excerpts from the deposition testimony of John, Nadav, and Weisfeld. Weisfeld, Norman Weisfeld, Nadav, Dienes, Jones, Park, Kim, and Roh were cross-examined at trial.

In light of the evidence received at trial, the following constitute this Court's findings of fact and conclusions of law.

### Background

In 1995, John placed an advertisement in *The New York Times* seeking financing for a men's apparel business that he had begun with friends three years earlier in Queens, New York using the trademark "FUBU," which is an acronym for the motto "For Us By Us." John and his friends were young, inner-city African–Americans interested in designing and selling clothing that they themselves would enjoy wearing. They were also interested in making a statement about who should profit from the sale of fashion to African–American youth. "It comes down to ownership," John stated in a magazine interview in 1999; "with us, you actually see African–Americans operating the company. We have a face our customers identify with."

Weisfeld, who was and remains President of Alliance Worldwide, Inc. ("Alliance"), a company engaged in the manufacture and sale of apparel, was among the

approximately twenty-five investors who responded to John's 1995 advertisement. Negotiations followed, and in November 1996, Alliance, John and his partners formed GTFM, Inc. All rights of John and his partners in the "FUBU" trademark were transferred to GTFM, Inc. At approximately the same time, Alliance entered into an agreement with Samsung America, Inc. ("Samsung") for the production of apparel designed by John. Alliance acted as a manufacturer and sales representative for the apparel and GTFM, Inc. was responsible for brand promotion and licensing.

GTFM, LLC was formed in 1998, to act as the master licensee for the "FUBU" brand. GTFM, Inc. granted GTFM, LLC a master license for all "FUBU" trademarks that included the right to enter into sublicenses. GTFM, LLC was also incorporated into the production agreement between Alliance and Samsung.

The "FUBU" brand has grown at an extraordinarily rapid pace over the past decade. In late 1993, John took out a mortgage on his mother's home to cover $60,000 in orders. When John sought financing in 1995, he was struggling to cover $300,000 in orders. GTFM's sales for the year 2001, in contrast, exceeded $350 million worldwide at wholesale. It projects its sales for the year 2002 to exceed $375 million worldwide at wholesale.

### GTFM's Use of the "05" Trademark

In 1993, John began to design mens sports jerseys prominently bearing the number "05" (pronounced "oh-five") as well as the "FUBU" trademark. John chose the number "5" to represent the founders of the "FUBU" brand. He placed a "0" before the "5" in an effort to distinguish the number from other numbers used to identify athletes, which typically do not begin with the number "0" except in the combination "00." Indeed, the parties have only been able to identify one professional athlete who ever wore any other number beginning with "0" and not ending in "0," and that was approximately ten years ago when Benito Santiago ("Santiago") of the San Diego Padres wore "09" for a brief time. Santiago currently wears the number "33." Between 1993 and 1997, musicians and celebrities began to wear John's "05" jerseys when they performed and made appearances. During that time, John designed sports jerseys bearing the "05" mark in large bold numerals to circumvent MTV's practice of blurring out trademarks in music videos. The "05" mark has since become so successful that customers will ask for "05" merchandise by name.

### Baseball and Football Jerseys

In 1997, John began to design a full line of baseball and football jerseys bearing the "05" mark. These jerseys continue to be GTFM's best-selling garments. GTFM claims trade dress rights in its baseball jerseys and in its football jerseys.

The baseball jerseys typically carry a main applique across the front of the jersey consisting of the "FUBU" trademark and the "05" trademark located below or below and to the right of the "FUBU" mark. The main applique typically consists of fabric overlays of contrasting colors. Some baseball jerseys also carry the word "League" within a flourish below the main "FUBU" mark. Some carry the phrase "FUBU Varsity." Others carry the "05" trademark on the back. The baseball jerseys also commonly carry various smaller patches and embroideries on the sleeves, some with patches on both the right and left sleeves, some with patches only on the left sleeve. These patches typically contain the "FUBU" trademark or the "FUBU" logo, which consists of two rectangular blocks, one standing upright, the other lying on its side, to form an L-like shape. The placement of patches on

the sleeves allows consumers to identify the garment as originating with GTFM even when it is hung sideways on a retail sales rack. All of the baseball jerseys also carry a rectangular patch on the lower left front on which is embroidered various phrases such as "Fubu Collection Official Sports Supplier," "Since 1992," "Authentic Circa 1992 Classic Collection," and/or the size of the garment. The fabric for the baseball jerseys is typically 100% polyester and appears in bright solid colors, sometimes with contrasting sleeve colors, or involves horizontal or vertical gradient color fades, sometimes resembling animal stripes. The shirts also commonly make use of neck tape with a black background and red or white lettering featuring the repeated use of the "FUBU" trademark combined with the word "sports." The tag at the back of the neck typically contains the "FUBU" trademark and the "FUBU" logo. The tag also typically carries the phrase "Since 1992." None of the baseball jerseys produced by plaintiffs carries any notification, in the form, for example, of an R in a circle or a "TM," that GTFM claims intellectual property rights in any of its registered or unregistered trademarks or trade dress.

The football jerseys typically feature the "05" mark in a block font with contrasting background shading under the front and back yokes and on the shoulders of the garment. As with the placement of patches on the sleeves of the baseball jerseys, the placement of the "05" on the shoulders of the football jerseys allows the garment to be identified as originating with GTFM when hung sideways on a retail sales rack. The football jerseys also typically feature the "FUBU" mark on the upper left chest of the garment in an italicized font and on the back across the yoke between two stars on a rectangular overlay sewn onto the garment. Like the baseball jerseys, the football jerseys also commonly carry various patches and em-broideries incorporating the "FUBU" mark or logo design. Some also carry patches on which are embroidered phrases such as "Official Champion" or "FUBU The Collection." The football jerseys typically carry a large, horizontal rectangular patch on the lower left of the front of the garment consisting of the "FUBU" trademark, the "FUBU" logo, and assorted phrases, such as "Sport Series Collection Limited Edition," as well as the size of the garment. The football jerseys are commonly made of 100% polyester brightly colored fabric, sometimes with contrasting yokes, horizontal or vertical gradient color fades, streaked patterns, or vertical stripes of alternating mesh and solid material fabric. Like the baseball jerseys, the football jerseys also commonly make use of black neck tape featuring the repeated use of the "FUBU" trademark in either red or white and the word "sports." As with the baseball jerseys, none of the football jerseys carries any notification that GTFM claims intellectual property rights in any of its registered or unregistered trademarks or trade dress.

GTFM recently provided the following definitions of its asserted trade dress in response to a discovery request. With regard to its baseball trade dress, GTFM stated:

The Fubu Baseball Jersey Trade Dress consists of a line of baseball-style jerseys that incorporate [*sic*] the following combination of design elements:

1. The "house" trademark (*i.e.,* "Fubu") depicted in cursive script across the front of the garment underlined with a long flourish.

2. The placement of the "05" trademark below and to the right of the "house" trademark on the front of the garment.

3. The elements described in (1) and (2) above, overlaid upon a contrasting color background;

4. The placement of various patches, embroideries and application [sic] on the garments, including:

 a. a rectangular, horizontal embroidered patch on the left sleeve of the garment;

 b. a smaller embroidered trademark logo design on the right sleeve of the garment; and

 c. a large, horizontal rectangular patch located on the lower left of the front of the garment.

5. The use of unique fabric and color treatments, including:

 a. bright colors and color combinations; and

 b. gradient color fades, *i.e.*, colors on the garment changing gradually into other colors on the garment, either vertically or horizontally;

6. The use of neck tape with a black background with red and/or white lettering, featuring repeating use of trademarks.

With regard to its football trade dress, GTFM offered a more elaborate definition:

The Fubu Football Jersey Trade Dress consists of a line of football-style jerseys that incorporate [*sic*] the following combination of design elements:

1. The placement of the "05" trademark:

 a. on the front of the garment under the front yoke, mid-chest;

 b. on the back of the garment, under the yoke, mid-back; and

 c. on the shoulders of the garment.

2. The use of a distinctive font style for the "05" trademark described in (1) above, namely a block font with contrasting background shading to give a "shadow" effect.

3. The placement of the "house" trademark (*i.e.*, "Fubu"):

 a. on the upper left chest of the garment in an italicized font style, above the mid-chest "05" trademark and below the shoulder "05" trademark;

 b. on the back of the garment across the yoke and below the neck ribbing;

 c. between two stars, one on either side of the "house" trademark as used in (b), above; and

 d. as used in (b) and (c) above, placed on a rectangular overlay sewn onto the garment.

4. The placement of various patches, embroideries and applications on the garments, including:

 a. a geometric shield with the words "Official XXL Champion," on the right chest of the garment;

 b. a large rectangular patch containing the "house" trademark and the words "The Collection" on the left sleeve of the garment;

 c. a smaller, embroidered trademark logo design on the right sleeve of the garment;

 d. a large, horizontal rectangular patch located on the lower left front of the garment; and

 e. a pentagonal patch featuring the "05" trademark at the center of the neck ribbing.

5. The use of unique fabric and color treatments, including:

 a. bright colors and color combinations; and

 b. gradient color fades, *i.e.*, colors on the garment changing gradually into other colors on the garment, either vertically or horizontally;

 c. a streaked color pattern; and

d. vertical stripes of alternating mesh and solid material fabric;

6. The use of neck tape with a black background with red and/or white lettering, featuring repeating use of trademarks.

Despite this effort to define a trade dress, the baseball and football jerseys consist of a wide variety of patch patterns, color patterns, and design features. The only trade dress elements consistently used on the jerseys are the "FUBU" trademark and the "05" trademark. The "05" trademark tends to be dominant on the football jerseys while the "FUBU" trademark tends to be dominant on the baseball jerseys. There are no other specific trade dress elements consistently used on all of GTFM's baseball jersey designs or football jersey designs. As John, GTFM's chief designer, stated in his deposition testimony, it is the presence of the "FUBU" trademark and "05" trademark that distinguishes GTFM jerseys from other jerseys in the marketplace:

Q: What characteristic about FUBU 05, 05 jerseys that makes [sic] it distinct, unique from others?

A: [ ] The fact that—well, we design several different jerseys so we try to use cutting-edge designs, which is just an aesthetic thing. But the major difference from our jerseys and everybody else's, which is it carries our mark, which is 05, is FUBU, or both can be combined and our fonts.

. . . .

Q: How would a customer know when he's looking at a FUBU product? How would we know it's a FUBU product?

A: He would know by the name either FUBU or 05.

Plaintiffs have used the "05" mark in tandem with the "FUBU" mark on a variety of garments in addition to the baseball and football jerseys, including baseball jackets, "racing" jackets, fleece pants,

acrylic sweaters, baseball hats, t-shirts, jogging sets, and sleep wear, for men, women, and children. Beginning in the year 2000, GTFM also began to use "05" and "FUBU" together with phrases such as "Dirty Dirty," "Dirty South," "Southside," or "Uptown" on its shirts. Nearly all of GTFM's garments are characterized by the use of bright colors, bold forms and connotations of athleticism. GTFM does not contend, however, that its entire line of apparel carries specific and consistently-used trade dress elements other than the "FUBU" and the "05" trademarks.

*GTFM's Sales and Advertising of the "05" Trademark*

The average wholesale price of GTFM's jerseys is $30. The jerseys retail for prices ranging from $60 to $120. The football jerseys and larger size jerseys carry extra patches and tend to cost more. GTFM jackets range in price from $75 to $300 retail. GTFM's apparel is available both at independent "mom and pop" sportswear stores as well as at large department stores, such as TJ Maxx, JCPenney, and those operated by the Federated and May Company department store chains. GTFM's customer base consists principally of males ranging from ages twelve to twenty-five.

Since 1998, GTFM has sold more than three million units of apparel items bearing the "05" trademark. The large majority of these items have been baseball and football jerseys. Sales of apparel bearing the "05" mark have resulted in gross revenues of nearly $87 million since 1998.

Since 1996, GTFM has spent approximately $16.6 million to advertise its apparel products. Approximately 50%, or $8 million, of this amount was directed towards the promotion of goods that bear the "05" trademark. GTFM print advertisements have appeared in magazines

such as *The Source, Vibe, Rolling Stone, GO, Teen People,* and *Maxim.*

GTFM admits that it's advertising expenditures are relatively low as compared to the expenditures of other apparel brands. GTFM has pursued a strategy of leveraging its advertising expenditures by persuading celebrities to wear its trademarks. For example, since 1994, the recording artist and actor LL Cool J has worn "05" garments in numerous music videos, television interviews, motion pictures, concerts, and public appearances, for which GTFM has paid him more than $4 million or approximately one-fourth of its total advertising expenditures of $16.6 million. Heavyweight boxing champion Lennox Lewis ("Lewis") also consistently wears GTFM apparel. Lewis recently appeared, for example, on the HBO sports interview program "On the Record" wearing an "05" baseball jersey. GTFM's compelling story of inner-city African–American entrepreneurs building their own apparel company against enormous odds has also received widespread, unsolicited media coverage on network and cable television programs such as ABC's World News Tonight, CNN's Business Unusual, Fox News's Cavuto Business Report, and ABC's The View, as well as in major newspapers. The "05" mark has also been the subject of several newspaper and magazine articles describing the cultural significance of "05" and "FUBU," particularly to the African–American community.

*Solid's Business*

In 1998, Park and Kim formed Solid Clothing Inc. as a California "S" corporation. Both Park and Kim had extensive experience in the apparel industry. From 1988 to 1995, Park worked as a wholesale salesmen for H & G International, an importer of clothing in Los Angeles. From 1990 to 1995, Kim opened and closed a series of apparel businesses in the Los Angeles area. In 1995, Park and Kim formed ZAM Clothing Company as a partnership to manufacture and wholesale men's casual wear. The two formed Solid three years later from the assets of their former partnership.

As is apparent from a review of its catalogues, Solid is a producer primarily of knock-off goods. As a recent inspection of its premises revealed, Solid maintains a collection of samples, computer assisted designs ("CADs"), hangtags, catalogues, and advertising for the clothing of popular garment manufacturers, such as Nike, Adidas, Tommy Hilfiger, and GTFM. It uses these samples and material to design and sell its own clothing.

In 1999, Solid's inventory included a wide variety of sports jerseys bearing the colors and sometimes the insignia of well-known professional sports teams. Some of these jerseys also bear the numbers of famous athletes, such as Michael Jordan's "23," Dallas Cowboy running-back Emmitt Smith's "22," or Green Bay Packer quarterback Brett Favre's "4." Solid has since shifted primarily to producing shirts bearing imprints of Japanese anime images like those created by Bandai Entertainment, Inc. under the "GUNDAM" trademark as well as the distinctive designs of fashion designer Gianni Versace. Since its founding, Solid has repeatedly received cease and desist letters from third parties complaining that it infringed their intellectual property rights: in December 1997, from Tommy Hilfiger Licensing Inc.; in April 1999, from High Image, Co.; in November 1999, from the Coalition to Protect the Advancement of Sports Logos; in February 2000, from Kairouz Corporation; in May 2000, from Hoffman California Fabrics; in February 2001, from Bandai Entertainment Inc.; and in January of this year from Usso Apparel Co., Inc. Nearly all of these disputes have resulted in set-

tlements whereby Solid agreed to cease and desist. Some also involved cash payments.

*Solid's Design, Manufacture and Sale of "05" Clothing*

In February 1999, Solid began to sell men's sports jerseys with the number "05" prominently displayed mid-chest on the front of the garment. Solid ordered these "05" jerseys from its Korean suppliers in the fall of 1998. The football jerseys also commonly carried a geographical designation on the upper left such as "New York." Sewn to the inside of the neck of the garments was a label on which was embroidered "ZS Sports" and the name "ZAM" under which Solid does business. Various hang-tags also carried "ZS Sports" or "ZAM" marks. The football jerseys in particular also carried a "ZS Sports" patch on the left sleeve of the garments.

Park and Kim have testified that their manufacturers in South Korea came up with the idea to use the number "05" on their apparel and chose the placement of the "ZS Sports" patch on the left sleeve. They contend that their manufacturers were aware of so many different Korean companies creating "05" garments for the American market that they merely recommended this design to Solid as a popular one and that Solid naively accepted the recommendation with no understanding that GTFM had or claimed to have trademark rights in the "05" mark. Park, in particular, has testified that Solid has little input into the design of its apparel and that at the time Solid began to sell "05" merchandise, he was aware of many users of the "05" designation, including GTFM. When cross-examined on this issue, however, Park was unable to identify any users of the "05" mark in early 1999, other than GTFM and Solid.

Park's and Kim's testimony that they chose to place the "05" designation on

their merchandise in good faith is not credible. It is belied by Solid's repeated copying of popular brands, by its deceit during the discovery process in this litigation, deceit that was designed to hide the extent of its sales of "05" clothing and materials relevant to an accurate assessment of its knowledge and intent, and by the perjury of Park in particular during his deposition and at trial. In this regard, Solid's bad faith is evident from its insistence that its apparel was in no way copied from GTFM's apparel. The similarities between Solid's and GTFM's jerseys are unmistakable, particularly with respect to elements of their trade dress. It is particularly telling that when GTFM inspected defendant's business premises in Los Angeles in June 2002, it found GTFM's Fall 1998 catalogue, which was released in the summer of 1998, and which includes numerous CADs of clothing bearing the "05" trademark. Solid's 1999 catalogue includes a full line of garments in which the most prominent feature is the display of "05." GTFM has shown through this and other evidence that Solid is the driving force in the design of the apparel that it orders and sells and that it intended from its first use of the number "05" to profit from the goodwill of GTFM's "05" brand.

*"PLAYERS 05"*

During 1999, Solid developed the idea of using the "PLAYERS 05" trademark on its apparel. The flourish under "Players" mimics the flourish that underlines the "FUBU" trademark. In Solid's catalogues from 2000 to 2002, the "PLAYERS 05" mark is shown on a variety of football and baseball jersey designs as well as t-shirts and jackets.

Solid's baseball jerseys typically carried a main applique across the front of the jersey consisting of the word "Players" in a cursive script, a flourish below "Players," and the number "05" in a smaller font

below and slightly to the left of the flourish. The main applique typically consisted of fabric overlays of contrasting colors. The baseball jerseys also carried various patches on which were embroidered various forms of the "PLAYERS 05" mark. Some shirts also carried embroidery on the right sleeve consisting of the letters "PS" in an interlocking pattern, apparently standing for "players." The baseball jerseys were made of 100% polyester and appeared either in bright solid colors, color gradient fades, or irregular streaks and stripes. Some baseball jerseys had black neck-tape on which was written either "Players" or "Players 05" in white or red lettering. All of the baseball jerseys had neck tags sewn into them on which was embroidered either the "PLAYERS 05" mark or similar designations such as "PS05."

The football jerseys commonly carried the number "05" in a block font with contrasting background shading under the front yoke at mid-chest as well as on each sleeve or shoulder. Some also carried "05" under the back yoke. The football jerseys also typically carried the word "Players" on the upper left chest of the garment in an italicized lower-case font and a patch on the upper right chest on which was embroidered phrases such as "XXL Players." Some also carried the word "Players" between two stars on a rectangular overlay sewn onto the back yoke of the garment. All football jerseys carried a large, horizontal rectangular patch on the lower left of the front of the garment on which was embroidered the "PLAYERS 05" mark. Solid's football jerseys were made of 100% polyester fabric and, like the baseball jerseys, often appeared either in bright solid colors, color gradient fades, or irregular steaks and stripes. Like its baseball jerseys, nearly all of its football jerseys had neck tags consisting of the "PLAYERS 05" mark or similar designations such as "PS05." One

football jersey entered into evidence by Solid, however, carried a neck tag consisting of the phrase "Men's Club."

In comparison to GTFM's "05" apparel, Solid's "PLAYERS 05" apparel is generally of lesser quality. For example, the main chest applique on Solid's baseball jerseys is typically a two-piece construction consisting of a solid-colored background with the "PLAYERS 05" mark sewn over it in a contrasting color. GTFM's main chest applique, in contrast, is a three-piece construction consisting of a background and two separate overlays that together create a shadow effect. Solid's fabric is also generally of lesser weight.

*Solid's Sales*

Solid's apparel bearing the number "05" generally sold at wholesale for prices ranging from $5 to $30 and at retail for prices ranging from 10% to 50% higher than the wholesale price. Solid's customer list is primarily composed of independent sportswear stores or individuals acting as retailers. Based on a comparison of Solid's customer list to GTFM's, GTFM calculates that 338 retailers are customers both of GTFM and Solid. Solid calculates that the number of retailers to which both GTFM and Solid sell merchandise is 325, and that this represents 7% of Fubu's customers and 12% of Solid's customers.

Solid also sold "05" apparel directly to the public through its own retail store. In cross-examination, Park insisted that Solid did not make retail sales of its apparel. Park was then shown a videotape recording of an undercover retail purchase on March 5, 2001, of "PLAYERS 05" apparel from the retail store at the front of Solid's business premises. Park confirmed that the store which appeared in the videotape was his place of business. The video shows a large, well-lit, attractive store with racks of garments bearing the "05" and "PLAYERS 05" marks. On one of the

front windows of the store appears a sign facing the street that advertises the store's sale of "PLAYERS 05" merchandise.

Solid sold "05" apparel beginning in February 1999, and continued to sell "05" apparel at least until November 2001, eight months after GTFM sued Solid. Solid intended to continue selling "PLAYERS 05" apparel into 2002. It published a 2002 catalogue featuring "PLAYERS 05" apparel.[1]

Based on a review of documents either produced by Solid or discovered at its premises on a recent inspection, GTFM calculates that since February 1999, Solid has sold at least 455,851 units of apparel bearing the "05" mark, and perhaps as many as 601,986 units. The higher figure includes sales of garments with style numbers that Solid has not identified such that it is impossible to determine if it is a sale of an "05" garment or of a garment that does not infringe the "05" mark. These sales are referred to as the "Unknowns."[2] The sales of the "05" garments generated $6,763,368.71 in revenue and, with the Unknown garments, a total of $8,633,646.67 in revenue. Of these total sales, approximately 35,962 "05" garments representing $460,023 in revenue were sold in 2001, that is, after the registration of GTFM's "05" mark on December 26, 2000, and approximately 118,572 units of "05" *and* Unknown apparel were sold in 2001, representing $1,499,282.56.

Based on the documents it produced to GTFM,[3] Solid calculates that it sold 286,233 garments bearing the number "05" and that its gross revenue from those sales amounts to $4,572,000. $3,442,772.05 of the total revenue is from the sale of garments on which on "05" appears alone on some portion of the garment, that is, without the word "Players" next to it. Solid calculates that it received $454,048.70 in revenue for sales of garments bearing the number "05" after December 26, 2000, the date of GTFM's registration of the "05" mark, and an additional $640,336.80 in revenue from sales of Unknowns after that date.

Solid contends that it no longer has documents for approximately 20% to 30% of its wholesale sales of "05" garments. It has produced few documents reflecting any of its own retail sales.

GTFM has shown that its calculations of sales and revenue are the more reliable. GTFM's calculations are supported by well-organized back-up material that identifies each invoice by date, invoice number, and style number. As a consequence, Solid was able to challenge the inclusion of three style numbers and plaintiff recalculated its damage figures. In contrast, although prepared by a well-intentioned paralegal, Solid's figures were insufficiently explained and depended on a variety of extrapolations for which there was no data trail. Moreover, Solid's figure of less than $3.5 million in gross revenue from the sale of "05" garments is at least several million

---

1. In its exhibit list, Solid incorrectly identifies this catalogue as the " 'Space' 1999 catalog with picture of robot on front cover." The catalogue is without doubt a 2002 catalogue. Its cover indicates in three different places that it is for the year 2002. Furthermore, it includes many "PLAYERS 05" and other jersey designs that Solid did not create before the year 2000.

2. Most style numbers have been matched to a particular kind of garment either through ex-

amination of those Solid catalogues that GTFM located from other sources or that Solid produced in discovery, or in a few instances, by examination of a garment that was found with the style number attached to it.

3. Apparently, Solid's calculations do not include the additional invoices discovered during the June 18 to 20 inspection by plaintiffs of its premises. Solid's calculations are based on invoices located as of June 17, 2002.

dollars short. Park admitted that in one year alone, Solid had received $5 million in revenue from the sale of "05" garments.

*Solid's Profits from the Sale of "05" Apparel*

Solid alleges that its profits from the sale of infringing goods amount to $824,906. It arrived at this amount by (1) calculating its revenues from the sale of apparel bearing the number "05" based on the records it produced in discovery and then (2) subtracting an amount calculated to represent its expenses associated with the manufacture and sale of the apparel.

Solid calculates its expenses for the manufacture and sale of "05" apparel as amounting to $3,747,094. The single largest component of this figure, and the only component for which Solid produced documents in discovery, is $2,290,000, which reflects payments to its Korean suppliers for apparel bearing the "05" designation. The difference of approximately $1.5 million is based on an extrapolation using Solid's unaudited financial statements for the years 1999 through 2001. For example, to compute Solid's domestic freight charges associated with apparel bearing the "05" designation, Solid took the total amount it spent on domestic freight for 1999, as indicated in that year's financial statement, and expressed that amount as a percentage of Solid's total sales for that year. It then did the same for 2000 and 2001, and averaged the three percentage figures to establish an average percentage figure for the years 1999 to 2001. Since Solid did not calculate its sales of "05" garments for each year, it applied an average percentage figure to its three years of sales. It then multiplied the average percentage figure by its calculation of its total sales of "05" merchandise, arriving at the sum of $106,527 for domestic shipping charges associated with the sale of the "05" merchandise. It reiterated this process for customs and international shipping charges (arriving at the sum of $839,876), trade show expenses ($42,519), and "overhead" charges ($468,172). The total for these expenses was calculated as $1,457,094.

The only reliable expense figure is the cost of the "05" merchandise purchased from Korea: $2,290,000. The other deductions are extrapolations from unaudited and false financial statements and, as a result, are undependable. The financial statements were prepared by an outside CPA using "checks" that Solid provided to him. The accountant did not come to Solid's offices to examine its books and records and was not given access to Solid's computerized data base of financial information. The financial statements, which merely compiled the financial information Solid provided to the accountant, were used to prepare Solid's tax returns and for business planning purposes.

A comparison of the financial statements to the records of the "05" sales demonstrates that the financial statements materially understate Solid's revenues. For each of the three years, 1999 to 2001, the financial statements reflect total sales of approximately $5 million and net profits before taxes of about $100,000. For example, the year 2000 financial statement reflects income from all sales of $5,050,476.71. This could only be accurate if Solid sold no garments other than "05" garments. Conservatively estimated, and based solely on the invoices produced in discovery and located in a recent inspection of Solid's offices, the revenue generated from Solid's sales of "05" clothing alone in 2000, was $4,483,631.73. This does not include any retail sales of "05" clothing or the "lost" invoices that Park estimates reflect up to 30% of Solid's sales of "PLAYERS 05" clothing. Apparel bearing the "05" designation accounts for roughly one-half of the offerings in the Solid Summer

2000 catalogue, and roughly one-eighth of Solid's offerings in its 1999 catalogue. At trial, Park estimated that Solid's total revenue for the year 2000 was approximately $15 million. He further estimated that 33% of Solid's revenue in that year was generated by its sale of "05" apparel. There is, therefore, strong evidence that the financial statements grossly understate Solid's revenues and, as a consequence materially overstate its expenses as a proportion of those revenues if the expenses were not understated to the same degree as the revenues.

There is, however, compelling evidence that the financial statements overstate the expenses as a proportion of revenue. According to Solid's calculations, its payments to its manufacturers for production of "05" clothing amount to roughly 50% of its revenue from the sale of that clothing;[4] on the financial statements, the ratio for each of the three years is between 66% to 69% for the cost of and revenue from the sale of all garments.[5] Consequently, any expense calculations based on the Solid financial statements must be rejected.

*GTFM's Calculation of its Lost Profits*

GTFM calculates that its lost profits from Solid's infringing conduct amount to $4,918,101, $3,751,067 of which is for the sale by Solid of garments known to bear the "05" mark and the remainder is from Solid's sale of the Unknown garments. In arriving at this figure, GTFM has assumed that each "05" garment sold by Solid would have been purchased from GTFM. While every purchaser of a Solid garment may have wanted to buy a GTFM garment, GTFM garments are far more expensive and not every Solid customer would have been able to or would have chosen to buy the more expensive albeit

genuine article of clothing. Illustrative of this point, there is relatively little overlap in their retail operations; their goods were sold at only a few hundred of the same stores.

*Solid's Application for the Registration of the "PLAYERS 05" Trademark*

In April 19, 1999, Solid's counsel John Park provided Solid with a trademark search opinion letter for the mark "PLAYERS 05." Notably, John Park's search opinion letter was dated one week after Solid received a cease and desist letter from High Image, Co. ("High Image"), dated April 12, 1999, in which High Image declared, *inter alia,* federal unfair competition rights under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), in the mark "PLAYERZ 69."

John Park focused his search on variations of the word "player" but did not apparently search variations of the number "05." Solid never consulted with John Park or any other attorney to learn whether "05" was available to use or to register. John Park advised Solid that it would likely be able to overcome any PTO objections and obtain registration for the "PLAYERS 05" mark. There is no evidence that Solid brought GTFM's "05" mark or its intention to capitalize on the success of that mark to John Park's attention, or that John Park was otherwise aware of these facts.

On April 26, 1999, Solid filed an intent-to-use application for the mark "PLAYERS 05" for International Class 25. On September 27, 1999, the PTO issued an Office Action objecting to Solid's application on the grounds that "PLAYERS 05" was confusingly similar with previously

---

4. According to Solid, it paid its suppliers $2,290,000 for the "05" clothing, and earned $4,572,000 in gross revenue from the sale of that clothing.

5. The year 2000 financial statement reflects sales of $5,070,042.09 and an expense of $3,371,878.71 to purchase the garments.

registered marks for International Class 25 containing the word "Players" and that certain provisions of Solid's identification of goods were unacceptable as indefinite.

Solid responded on March 22, 2000 by amending its identification of goods and arguing that there would be no likelihood of confusion between "PLAYERS 05" and other marks containing the word "Players." Solid argued, among other things, that the marks "PLAYERS 05" and "PLAYERS" do not have the same "stress pattern" because, in the former, "05" is given emphasis:

> [Solid's] mark is most stressed on the number "0," more stressed on the last number "5," and least stressed on the word "PLAYERS." In fact, for [Solid's] mark, when it is read, both numbers "0" and "5" are stressed but the word "PLAYERS" is not.

Solid further argued that "05" is itself a distinctive mark:

> Contrast [sic] to the cited mark, [Solid's] mark "PLAYERS 05" is distinctive, not by the word "players," but because of the independent and distinctive number "05." The number "05" of [Solid's] mark, along with the word "Players" is used to identify [Solid]. [Solid's] mark, because of the number "05," does not convey any aspect, purpose, function or use, or describable characteristics of the goods. Therefore, the applicant's mark is distinctive.

"PLAYERS 05" was published for opposition on July 4, 2000.

*GTFM's Application for the Registration of Its "FUBU 05" and "05" Marks and Opposition to the Registration of Solid's "PLAYERS 05" Mark*

On March 22, 1999, GTFM filed trademark applications for its "FUBU 05" and "05" marks for International Class 25. There is no evidence that any other garment company was selling sportswear with the "05" mark as of March 1999, except

Solid, and GTFM did not learn of Solid's use of the 05 mark until the PTO published "PLAYERS 05" in the Official Gazette in July 2000.

On January 6, 2000, the PTO issued an Office Action objecting to the registration of the "05" mark on the ground that GTFM's mark was confusingly similar to a previously registered mark owned by Hendrickson Motorsports, Inc. ("Hendrickson") and used by the NASCAR driver Terry Labonte. This mark consisted of a stylized "5" and was registered for International Class 25, among others. The PTO cited no other marks against GTFM's application.

On July 6, 2000, GTFM responded. It argued, *inter alia*, that the PTO had previously allowed the registration of numerous marks consisting solely of or containing the number "5" in International Classes overlapping with those in which Hendrickson's stylized "5" was registered. GTFM reasoned that if the PTO had determined that these other marks were not confusingly similar with the stylized "5," then its own "05" mark should also be approved for registration as not confusingly similar to Hendrickson's mark. Pointing to twenty-seven marks consisting solely of the number "5" that had been approved for publication in the Official Gazette or registered with the PTO, GTFM argued that the widespread use of "5" as a mark indicated that the mark "5" was "entitled to only a narrow scope of protection."

Among the marks GTFM cited in its July 6 response was Solid's "PLAYERS 05" mark, which had been published for opposition only two days earlier. This was the first time that GTFM or its counsel had heard of the "PLAYERS 05" mark. Counsel for GTFM ordered a copy of the PTO file for the "PLAYERS 05" mark on July 6 and opened an investigation of the mark four days later. It then directed

that a purchase be made of a "PLAYERS 05" garment, which occurred on July 12.

GTFM subsequently filed three requests for a thirty-day extension of time in which to file a Notice of Opposition to Solid's "PLAYERS 05" application. After it learned that its office action response with respect to the "05" mark was successful and that the "05" mark had been published for opposition in the PTO's *Official Gazette*, GTFM filed its Notice of Opposition on November 1, 2000. The PTO sent the Notice of Opposition to Solid's counsel on November 14, 2000. Answer was due on December 24, 2000. On March 6, 2001, no answer having been filed, GTFM filed a motion for entry of default judgment. After receiving notice of the motion, Solid asserted that it had never received GTFM's notice of opposition from the PTO. The parties thereafter stipulated to a withdrawal of the motion and an extension of time to file an answer.

Given the many misrepresentations that Solid made through the course of this litigation, some of them made through counsel, it is difficult to assess its claim that it never received GTFM's notice of opposition. For example, it is now undisputed that Solid continued to sell "05" garments during the time it was negotiating with the plaintiffs following the filing of this lawsuit. During these negotiations, however, Solid and its counsel materially misrepresented the quantity of sales Solid had made—revealing less than 5% of its sales—and falsely asserted that Solid had stopped selling "05" garments in 2000. This Court finds that it is far more likely that the notice was mailed to and received by Solid's trademark counsel, but was for some reason either misplaced or neglected.

The opposition proceeding involving the "PLAYERS 05" mark is currently stayed pending the outcome of this litigation. On December 26, 2000, the "05" and "FUBU 05" marks were entered on the Principal Register as Trademark Nos. 2,415,190 and 2,415,191, respectively.

*Nadav and Weisfeld's Inspection of Solid's Booth at the "Magic Show"*

In 2000, both Nadav and Weisfeld attended a large national trade show in Las Vegas, Nevada known as the "Magic Show" where both GTFM and Solid were operating booths. While touring the show, Nadav passed Solid's booth. Upon observing its display of "PLAYERS 05" apparel, he believed that Solid was a "jobber" of GTFM merchandise, *i.e.*, a company that purchases merchandise left over from a previous season at a discount price and sells it below wholesale. He approached the booth and spoke with a salesperson, who told him that the "PLAYERS 05" apparel was available in sizes which Nadav knew to be those most commonly sold by GTFM. Nadav also learned that the "PLAYERS 05" merchandise was available at wholesale prices significantly lower than those offered by GTFM. When Nadav saw the word "players" on Solid's apparel, he believed that the word was being used descriptively to stand for "someone who is a 'player' in the community or a sports player" rather than as part of a trademark.

Nadav then asked Weisfeld why GTFM was selling jerseys to another customer at prices significantly lower than those offered to him. Weisfeld immediately checked with GTFM's own salespeople at the trade show to determine if GTFM had ever sold apparel to Solid and learned that GTFM had not.

*GTFM's Policing of Its "05" Mark*

Since 1999, GTFM has aggressively enforced its rights in the "FUBU," "FUBU 05" and "05" trademarks. GTFM has produced a voluminous record of cease and desist letters and is currently engaged in twenty separate litigations involving the "05" mark.

GTFM employed private investigators from July 2000 to March 2001, to visit Solid's retail premises in Los Angeles and make purchases of Solid apparel. One of the investigators conducted an undercover purchase of Solid garments on March 5, 2001, and recorded that purchase on videotape.

*Solid's Conduct of Discovery*

On March 28, 2001, GTFM filed this lawsuit. Based on Solid's conduct during discovery, GTFM has moved to preclude Solid from presenting evidence at trial of its sales or expenses, of a lack of knowledge of the plaintiffs' "05" mark and products, and of a lack of intent to copy and infringe the "05" mark. Through the course of this litigation, Solid systematically concealed its sales of apparel bearing the "05" designation and its profits from those sales. While the motion to preclude Solid's evidence is denied, the evidence and arguments submitted by the parties in connection with this motion shall be used in evaluating the evidence and arguments presented by the defendant at trial. Solid's conduct in discovery reflects directly on the credibility of its statements of profits and expenses and on its denial of predatory intent.

On May 7, 2001, counsel for Solid produced a chart showing that Solid had sold a total of nine different styles of garments bearing the "05" designation or 19,271 garments. It represented that Solid had not sold "any items with the 'PLAYERS 05' or '05' marks since June 23, 2000." [6] When GTFM responded that the two Solid catalogues it then had in its possession included at least twenty-three different styles of goods bearing the "05" mark, Solid continued to assert through its counsel that the nine style numbers it listed in its letter were "the only items … that

have been sold. None of the other styles were sold so no other information exists or is needed." Solid reported that its total profits from the sale of 19,271 units of "05" apparel amounted to $21,154.95.

On August 17, 2001, Solid made its initial mandatory disclosure pursuant to Rule 26(a), Fed.R.Civ.P. It produced 421 documents, of which 397 related to *GTFM's* application for registration of the "05" trademark and the other twenty-four consisted of the Solid catalogues that Solid's counsel knew GTFM already had. In response to GTFM's First Request for the Production of Documents and Things, Solid referred to its earlier production and produced no further documents.

After further prompting from plaintiff, and extended negotiations regarding a protective order, Solid made another production of documents on November 8, 2001, which consisted of seventy-three additional pages. Of these, ten pages consisted of copies of commercial invoices issued by Solid's suppliers and the remainder consisted of Solid's insurance policy. In light of what Solid produced on November 8, it is apparent that its negotiations with GTFM for a protective order were conducted in bad faith for purposes of delaying the discovery process.

GTFM then presented Solid with a copy of an invoice that it had obtained from a retailer reflecting Solid's sale of an "05" style number not previously disclosed by Solid and occurring on January 15, 2001, nearly six months after the date Solid's counsel had given as its last sale of "05" merchandise. GTFM demanded that Solid produce all responsive documents by December 7, 2001. By letter dated November 29, 2001, Solid's counsel responded by

---

**6.** As noted above, a videotape from March 2001, shows that Solid itself was selling racks of "05" clothing to the public from its own

store nine months after June 2000, its purported final sale date.

stating that its records were "incomplete and not organized in accordance with a particular product," but that it would produce any additional relevant documents by December 7. On that date, Solid produced an additional 168 pages, which consisted of copies of ten commercial invoices from Solid's suppliers, sixty-six sales invoices issued by Solid to retailers, and eighty-two pages of largely illegible courier slips.

In January 2002, Park wrote directly to Weisfeld, stating: "My company ... did not sell many 'Players 05' shirts. My company stopped selling those shirts more than a year ago." Park made this statement notwithstanding the fact that Solid had sold "PLAYERS 05" merchandise at least as late as November 2001, and published a 2002 catalogue featuring "PLAYERS 05" apparel.

On February 11, 2002, Solid produced four more commercial invoices, fourteen more sales invoices, and three courier receipts. Based upon the documents produced by Solid as of that date, GTFM calculated that Solid had sold 27,287 units of apparel bearing the "05" mark, generating revenue of approximately $350,000.

By letter dated March 5, 2002, defendant's counsel made to this Court the following representation:

Plaintiff's claims about being provided with incomplete discovery are false. Defendant has conducted yet a further investigation after receiving plaintiff's letter of March 4, 2002, and has determined there are *no additional documents* responsive to plaintiff's requests.

(Emphasis in original). On April 5, 2002, the Court entered a Discovery Order directing Solid, *inter alia*, to comply with the Order by April 19, 2002, and its counsel to submit a written statement at the time of production confirming the completeness of the search for and production of documents covered by the Order. On April 19, Solid produced approximately 10,000 additional pages of documents. Among these documents were thousands of sales invoices not previously produced. Also produced were the cease and desist letters Solid had received alleging that Solid had engaged in trademark and/or copyright infringement. These letters were requested by GTFM in its First Request for the Production of Documents and Things, dated August 21, 2001. It was now clear that Park had testified falsely at his February 14, 2002 deposition when he asserted that neither Solid nor its principals had ever received any such letters and that Solid had already produced all of its documents relating to "PLAYERS 05" garments that were in its possession.

On May 13, Solid produced an additional 600 pages of invoices. On May 16, it disclosed that its calculation of gross revenue from the sale of "05" apparel had increased by $500,000 to $4,178,000, but claimed a net profit from the sale of "05" apparel of $200,000 *less* than what it claimed before. On June 6, Solid produced an additional 1,000 pages of documents including 400 additional invoices relating to "05" apparel, and on June 18, Solid also produced an additional 413 pages of documents, including approximately 400 additional invoices.

From June 18 to June 20, 2002, GTFM conducted an onsite inspection of Solid's place of business. The inspection revealed, *inter alia*, that Solid maintained in good order binders containing commercial invoices, letter of credit information and shipping documents. These binders included, in addition to the letters of credit themselves, computer-generated tables summarizing shipments of goods to Solid involving letters of credit. GTFM also found twelve boxes containing bound volumes of sales invoices for the period 1999 to 2001. GTFM's brief inspection of these volumes revealed numerous invoices for

the sale of "05" apparel that Solid had never produced to GTFM. Solid was also shown to maintain detailed computer records of its sales going back at least to September 27, 2001. GTFM also discovered twelve computer disks whose labels suggested that they were backup disks for Solid's computer records before September 2001. Solid claims that it no longer possesses the software capable of reading the disks. Although GTFM had specifically requested from Solid all relevant "documents stored in any computer memory (or retrievable by a computer)" in its August 21, 2001 First Request for Documents and Things, Solid never produced any computer data for GTFM's review. In addition, GTFM's counsel discovered a "FUBU Jeans" hat, "FUBU" hangtags, and the 1998 FUBU summer catalogue. Of these, the "FUBU Jeans" hat and some of the "FUBU" hangtags disappeared through the course of the onsite inspection. Kim has admitted that he was responsible for the removal of the "FUBU Jeans" hat but claims no knowledge of why or how the hangtags were removed.

### Conclusions of Law

*I. Solid's Infringement of GTFM's "05" Trademark*

■ To establish a trademark infringement claim under either Section 32 or 43(a) of the Act, 15 U.S.C. §§ 1114(1), 1125(a), a plaintiff must show that (1) it has a valid mark entitled to protection and (2) the defendant's use of the mark is likely to cause confusion. *Time, Inc. v. Petersen Publ'g Co., L.L.C.,* 173 F.3d 113, 117 (2d Cir.1999).

*A. The Validity of the "05" Trademark*

Solid's sales of apparel bearing the number "05" began in February 1999. Because a substantial portion of Solid's infringing conduct occurred before the "05" mark was registered, the "05" mark will be analyzed as an unregistered mark.

■ The owner of an unregistered mark bears the burden of proving that the mark is valid and entitled to protection. *Reese Publ'g Co. v. Hampton Int'l Communications,* 620 F.2d 7, 11 (2d Cir.1980). "To be valid and protectible [*sic*], a mark must be capable of distinguishing the products it marks from those of others." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,* 192 F.3d 337, 344 (2d Cir. 1999). "An identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (emphasis in original).

> [A] mark is inherently distinctive if its intrinsic nature serves to identify a particular source. In the context of word marks, courts have applied the now-classic test originally formulated by Judge Friendly, in which word marks that are "arbitrary" ("Camel" cigarettes), "fanciful" ("Kodak" film), or "suggestive" ("Tide" laundry detergent) are held to be inherently distinctive.

*Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 210–11, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) (citations omitted). Inherently distinctive marks "almost *automatically* tell a customer that they refer to a brand," *Qualitex Co. v. Jacobson Prod. Co.,* 514 U.S. 159, 162–63, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (emphasis in original), and "immediately ... signal a brand or a product 'source,'" *id.* at 163, 115 S.Ct. 1300. "[A] mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Wal–Mart Stores,* 529 U.S. at 211, 120 S.Ct. 1339 (citation omitted). Trademarks which are,

in Judge Friendly's terminology, "descriptive" of the goods to which they are affixed require a showing of secondary meaning to be entitled to protection. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10 (2d Cir.1976). Secondary meaning exists where "the public is moved in any degree to buy an article because of its source." *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 n. 4 (2d Cir.1997).

█ The appearance of the number "05" on a sports jersey does not "automatically" signal to a consumer that it refers to a brand. On the contrary, it has the appearance of an athlete's identifying number, albeit an uncommon one that begins with the number "0." This is especially the case on GTFM's sports jerseys, where the "05" number is deliberately given the appearance, both in its placement and font, of a baseball or football player's identifying number. The "05" mark as used by GTFM on its sportswear is "descriptive" of the athletic activity for which the apparel is ostensibly designed.

█ Because the "05" mark is descriptive, GTFM must show that it had acquired secondary meaning during the period when it was infringed. The Second Circuit has identified six non-exclusive factors in assessing the acquired distinctiveness or secondary meaning of a mark: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1222 (2d Cir.1987); *see also Genesee Brewing Co.*, 124 F.3d at 143 n. 4. No single factor in this inquiry is dispositive. *Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir.1985).

█ GTFM has shown that its "05" mark has acquired distinctiveness. GTFM has spent in excess of $8 million to advertise clothing bearing the "05" mark. "The characteristics of the relevant market are important in considering advertising expenditures," *Centaur*, 830 F.2d at 1222, and GTFM admits that its advertising expenditures are relatively low as compared to those of other apparel brands. GTFM has shown, however, that its "05" mark has achieved widespread public exposure through its affiliation with prominent celebrities. While it is true that much of the advertising of GTFM clothing shows the "FUBU" mark as well as the "05" mark, the "05" mark is clearly presented in the advertising and in some of the publicity it is the only visible mark. GTFM has also shown widespread unsolicited media coverage of the "05" mark.

GTFM's sales of more than 3 million garments bearing the "05" mark with gross revenues of nearly $87 million also supports a finding of secondary meaning, as does GTFM's consistent use of the number "05" since 1993, as a designation of source. While the "FUBU" mark appears on all of GTFM's clothing, on many of its most popular garments the "05" mark is the dominant mark. Furthermore, the efforts of Solid and many others to copy the "05" mark is strong evidence that these rivals recognized that the "05" mark had acquired secondary meaning in the marketplace. Finally, although plaintiffs have failed to present consumer survey evidence of secondary meaning, "every element need not be proved" for a determination of secondary meaning to be made. *Thompson Med.*, 753 F.2d at 217.

B. *The Likelihood of Confusion Between GTFM's and Solid's Uses of "05"*

█ To show that defendant's mark is likely to cause confusion, a plaintiff must prove that "numerous ordinary prudent purchasers are likely to be misled or con-

fused" because of the defendant's mark. *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 477 (2d Cir.1996) (citation omitted). A finding of infringement must be supported by "a probability of confusion, not a mere possibility." *Streetwise Maps, Inc. v. Vandam, Inc.,* 159 F.3d 739, 743 (2d Cir.1998); *see also Estee Lauder Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1510 (2d Cir.1997).

*Polaroid Corp. v. Polarad Elec. Corp.,* 287 F.2d 492, 495 (2d Cir.1961), identifies eight non-exhaustive factors relevant to the likelihood of confusion inquiry. *TCPIP Holding Co. v. Haar Communications Inc.,* 244 F.3d 88, 100 (2d Cir.2001). "Although no one factor is necessarily dispositive, any one factor may prove to be so." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 269 F.3d 114, 119 (2d Cir.2001). Further,

> [T]he evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused.

*Nabisco, Inc. v. Warner–Lambert Co.,* 220 F.3d 43, 46 (2d Cir.2000) (citation omitted).

*Strength of the "05" Mark*

"The strength, or distinctiveness, of a mark is its power to identify the source of a product." *Time,* 173 F.3d at 117; *see also Estee Lauder Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1510 (2d Cir.1997) (quoting *Restatement* comment that strength "ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source"). In gauging the strength of a mark, a court considers two factors: "its inherent distinctiveness, and its distinctiveness in the marketplace." *Streetwise Maps,* 159 F.3d at 743.

As indicated above, the "05" mark is not inherently distinctive as affixed to sportswear. Furthermore, as GTFM admitted in its response to the Office Action of the PTO initially opposing the registration of the "05" mark, the mark "5" is "entitled to only a narrow scope of protection" because of the crowded field of marks consisting either in whole or part of the number "5." As also indicated above, however, the "05" mark has achieved distinctiveness in the marketplace. By 1999, it had become a sufficiently strong mark to create an explosion in sales and to attract a number of imitators, including the defendant.

*Similarity of the Marks*

To assess the similarity between two marks, the Court considers whether the similarity is likely to cause consumer confusion. *Morningside Group,* 182 F.3d at 139–40. The similarity of marks is determined by evaluating a mark in its entirety, and in the context in which it is presented. *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.,* 228 F.3d 56, 66 (2d Cir.2000).

In its initial sales of garments bearing the "05" mark, Solid directly copied GTFM's mark and used it in an identical way on the same kind of garments. Solid's use of its own trade names in different places on its garments was not prominent and was insufficient to dispel any confusion. Solid's creation of the "PLAYERS 05" mark did little to distance its use of "05" from GTFM's use of that mark.

As Solid itself stated in its application to register the "PLAYERS 05" mark with the PTO, the dominant feature of the "Players 05" mark is the number "05." As Solid admitted, the word "players" is not stressed. This is especially true with respect to Solid's football jerseys, on which the word "players" appears in a significantly smaller font than the number "05." In general, it is quite apparent from a

comparison of GTFM's and Solid's apparel that Solid intended to imitate as closely as possible the placement and font of the "05" mark as it appeared on GTFM's jerseys. When the "05" mark is viewed in the context of an entire garment, the similarity is particularly striking. As used by Solid on its sportswear, the "PLAYERS 05" mark is very similar to GTFM's "05" mark.

Solid urges the Court not to compare its use of the number "05" with GTFM's, but rather to compare its use of the mark "PLAYERS 05" with GTFM's use of the mark "FUBU 05." Solid urges that the word "Players" cannot be confused with the mark "FUBU," and since it did not use "FUBU" on its sportswear, consumers would not have been confused into thinking that the sportswear originated with GTFM. It is true that the prominent use of brand names can go a long way towards eliminating confusion. *See, e.g., Nora Beverages,* 269 F.3d at 122. It did not do so here.

There is no evidence that "Players" is perceived as a brand name. Moreover, Solid's argument is premised on the assumption that the "FUBU" mark is the dominant mark on GTFM apparel, and the "05" mark is far weaker. GTFM has shown, however, that the appearance of the number "05" on sportswear is sufficient in itself, regardless of the presence or absence of the "FUBU" mark, to invoke the goodwill of GTFM's apparel. Nadav testified that many of his customers ask for "05" merchandise by name. For these consumers, the presence of the number "05" on a jersey alone is sufficient to convince them that they are buying a GTFM product. The press reports regarding the popularity of "05" clothing and GTFM's strategy of using celebrities to wear clothing that prominently displays the "05" mark confirm this testimony. The record evidence, including catalogues, CADs, and articles of clothing, shows that while the "FUBU" mark is a prominent feature on many of GTFM's designs, on many others it is the "05" mark with or without the "FUBU" mark that is emphasized and featured. Solid has not shown that the appearance of the word "Players" on sportswear also bearing the number "05" will somehow disabuse consumers of the confusion otherwise caused by the number "05."

*The Proximity of the Products in the Marketplace and GTFM's Likelihood of Bridging the Gap Between the Products*

Courts assess the proximity of the products to determine "whether the two products compete in the same market," *Streetwise Maps,* 159 F.3d at 745. Bridging the gap refers to "the likelihood that the plaintiff will enter the market occupied by the defendant's product to compete against the defendant." *Id.* at 743. Both of these factors weigh heavily in favor of GTFM. GTFM has shown that hundreds of retailers who bought Solid apparel also bought GTFM apparel. Although Solid's "PLAYERS 05" apparel was sold at lower prices than GTFM's "05" apparel, the difference was not so great as to preclude the possibility that GTFM's apparel was being sold at a discount. Finally, there is no "gap" to be "bridged" by GTFM. Solid and GTFM were already selling essentially the same kinds of apparel to the same group of consumers.

*Evidence of Actual Confusion*

Actual confusion may be shown either through direct evidence of instances of confusion, such as anecdotal evidence by consumers, or through survey evidence. *The Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 964 (2d Cir. 1996). It is well established that "actual confusion need not be shown to prevail under the Lanham Act." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 875 (2d Cir.1986). However, "its lack may under some circumstances be

used against the plaintiff." *Cadbury Beverages, Inc.*, 73 F.3d at 482 (citation omitted). "The lack of survey evidence," in particular, "counts against finding actual confusion." *Merriam–Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir.1994); *see also Sports Authority*, 89 F.3d at 964.

GTFM has presented no survey evidence and only one anecdote in support of actual confusion, specifically, Nadav's account of his confusion at the "Magic Show." Solid argues that Nadav's account should not be considered because, first, he is wholesale rather than a retail buyer of apparel and, second, his confusion did not result in the purchase of infringing goods. It is precisely because Nadav is a wholesale buyer, however, that his confusion forms persuasive evidence of more widespread confusion by retail consumers. As a professional buyer of millions of dollars worth of GTFM apparel, Nadav was fully familiar with GTFM's merchandise. He is the quintessential sophisticated buyer. His confusion speaks volumes about the likely confusion of less informed consumers.

*Solid's Bad Faith*

"The intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product." *Streetwise Maps*, 159 F.3d at 745. "Where a second-comer acts in bad faith and intentionally copies a trademark or trade dress," however, "a presumption arises that the copier has succeeded in causing confusion." *Paddington Corp. v. Attiki Importers & Distrib., Inc.*, 996 F.2d 577, 586–87 (2d Cir.1993).

Solid cannot reasonably claim to have acted in good faith. To begin with, the similarities between Solid's and GTFM's use of the number "05" are so strong that they could only have occurred through deliberate copying. GTFM has shown that Solid was aware of the "05" mark and was in possession of a 1998 catalogue of GTFM apparel as well as numerous pictures of GTFM "05" garments. That Solid has been involved in numerous infringement actions in the past confirms its bad faith. *See Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir.1995) (in finding wilful infringement, noting that "defendants had been sued in a similar trademark infringement case in the past"). Solid's attempt to rely on an opinion from an attorney regarding the viability of the "PLAYERS 05" mark is unavailing since that attorney analyzed the word "players" only and there is no evidence that Solid informed him of GTFM's use of "05." The failure to produce evidence regarding the magnitude of its sales and the perjury committed by its principals during their testimony both at deposition and trial [7] are further evidence of its consciousness of wrongdoing.

Solid argues that even if it intentionally copied GTFM's designs, it did not act in bad faith since it did not understand until March 2001 that GTFM was using "05" as a trademark. Even after March 2001, however, Solid continued to use the "05" mark on its garments and to lie to GTFM about doing so. Furthermore, Solid's long practice of knocking-off other trademarks belies its argument that is was an innocent infringer. The record in this case and Solid's conduct through the course of this

---

**7.** At trial, Solid's principals denied that they had ever copied GTFM's garments and asserted that they had come up with the ideas for their own garments without referring to GTFM's garments. While the plaintiffs have not succeeded on their trade dress claim, for reasons described below, a comparison of the defendant's "PLAYERS 05" sports jerseys with the plaintiffs' "05" jerseys shows that the defendant copied the plaintiffs' designs with meticulous attention to detail.

litigation shows the contrary, that Solid was in fact a very sophisticated infringer that built a multi-million dollar business by knocking-off other businesses' trademarks. Solid was not seeking to compete merely by imitating the successful features of GTFM's product. Its intent was rather to deceive purchasers of its garments into thinking that the garments were made by GTFM.

*Quality of Solid's Product*

The quality of a junior user's product can be relevant in two ways: (1) an inferior product may cause injury to the plaintiff trademark owner because people may think that the senior and junior products came from the same source; or (2) products of equal quality may tend to create confusion as to the source because of this very similarity.

*Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 505 (2d Cir.1996); *see also Morningside Group,* 182 F.3d at 142 (similar quality creates confusion). Although GTFM's apparel is of better quality than Solid's, the difference is not so great as to suggest that Solid's apparel originates from a source other than GTFM. This factor weighs in favor of consumer confusion.

*Sophistication of the Relevant Consumer Group*

Likelihood of confusion must be assessed by examining the level of sophistication of the relevant buyers. A trial court must consider the general impression of the ordinary consumer, buying under normal market conditions and giving the attention such purchasers usually give in purchasing the product at issue.

*Streetwise Maps,* 159 F.3d at 746. Although some consumers of GTFM's "05" apparel may be expected to inspect the apparel closely and try it on in front of a mirror, other consumers who are buying the apparel as gifts or from sources without full length mirrors may not bring such care to their purchases. More significantly, consumers in the post-sale context will not likely have the opportunity closely to inspect apparel bearing the number "05" to determine whether the apparel originates with GTFM or some other source. *See Nabisco,* 191 F.3d at 218 ("Infringement cases have consistently held post-sale confusion as well [as] point-of-sale confusion to be actionable under the Lanham Act."); *see also Hermes Int'l v. Lederer de Paris Fifth Avenue, Inc.,* 219 F.3d 104, 108 (2d Cir.2000) ("[P]ost-sale confusion can occur when a manufacturer of knockoff goods offers consumers a cheap knockoff copy of the original manufacturer's more expensive product, thus allowing a buyer to acquire the prestige of owning what appears to be the more expensive product.").

In summary, each of the *Polaroid* factors weighs, to a greater or lesser extent, in favor of plaintiffs. When weighed together, GTFM has shown that numerous ordinary prudent purchasers of garments like those at issue here were likely to be confused by the defendant's use of "05" on clothing.

## II. GTFM's Claim for Trade Dress Infringement

To succeed in a claim for trade dress infringement under Section 43(a) of the Act, a plaintiff must show "(a) that its trade dress is entitled to protection under the Act, and (b) that the defendant's dress infringes on the plaintiffs' dress by creating a likelihood of confusion." *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 377 (2d Cir.1997). A plaintiff asserting that the trade dress of an entire line of different products is entitled to protection "must articulate the specific common elements sought to be protected." *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 118 (2d Cir.2001). "[A] plaintiffs'

inability to explain to a court exactly which aspects of its product design(s) merit protection may indicate that its claim is pitched at an improper level of generality, *i.e.*, the claimant seeks protection for an unprotectable style, theme or idea." *Landscape Forms*, 113 F.3d at 381. In addition to specifying the elements of its trade dress, a plaintiff seeking trade dress protection for an entire product line must "establish[ ] that the 'overall look' in each separate product is 'consistent.' " *Yurman Design*, 262 F.3d at 116 (citation omitted).

 GTFM has failed to articulate the specific common elements of its baseball jersey and football jersey trade dress for which its seeks protection. Its definition of its trade dress is "altogether too broad to be a protectable source-identifying expression." *Id.* at 118. For example, GTFM has defined the fifth element of its baseball jersey trade dress as "[t]he use of unique fabric and color treatments, including ... bright colors and color combinations; and ... gradient color fades." It has defined the fourth element as "the placement of various patches, embroideries and application [sic] on the garments." In defining its trade dress in such general terms, GTFM seeks to protect an unprotectable style. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 33 (2d Cir.1995) ("The level of generality at which a trade dress is described, as well as the fact that a similar trade dress is already being used by manufacturers of other kinds of products, may indicate that the dress is no more than a concept or idea to be applied to particular products.")

GTFM has also failed to establish that the overall look of its baseball and football jerseys is consistent across each of the product lines. The only significant elements that are common to all styles within the product lines are the use of the "FUBU" and "05" trademarks.

### III. GTFM's Claim for Trademark Dilution Under Section 43(c) of the Lanham Act

 GTFM alleges that Solid's use of the number "05" and "PLAYERS 05" mark on its apparel violates the anti-dilution provisions of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). Section 43(c) provides, in pertinent part, that:

> [t]he owner of a famous mark shall be entitled, subject to the principles of equity ... to an injunction against another person's commercial use ... of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark. . . .

15 U.S.C. § 1125(c)(1). Dilution is defined by the statute as

> the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception.

15 U.S.C. § 1127. There are five elements of a trademark dilution claim in the Second Circuit: "(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." *Nabisco*, 191 F.3d at 215. In the Second Circuit, a mark must be both inherently distinctive and famous to benefit from anti-dilution protection. *TCPIP Holding Co. v. Haar Communications Inc.*, 244 F.3d 88, 95 (2d Cir. 2001).

 As stated above, the trademark "05" as it is used by GTFM on sportswear is not inherently distinctive. Thus, it cannot receive anti-dilution protection in the Second Circuit. *Id.* at 98.

Furthermore, the "05" mark is not a "famous mark" for purposes of anti-dilution protection under Section 43(c) of the Act. In establishing anti-dilution protection under the Act, "Congress envisioned that marks would qualify as 'famous' only if they carried a substantial degree of fame," *id.* at 99, such as marks that are "household words throughout the United States," *id.*, or are among "the best known marks in commerce," *id.* In an effort to provide guidance to courts considering whether a mark is "famous" under the Act, the Act provides a non-exclusive list of eight factors that may be considered. *See* 15 U.S.C. § 1125(c)(1). These factors strongly weigh against a finding that the "05" trademark is a "famous mark." As already noted, the mark is not inherently distinctive and has not acquired so substantial a degree of secondary meaning as to qualify as anything like a household word. Furthermore, the mark exists in a crowded field of marks consisting of or containing the number "5." GTFM began to use the "05" mark less than a decade ago, and GTFM registered it less than two years ago. GTFM's advertising expenditures and the publicity generated by them have not raised the mark to a level of fame that merits anti-dilution protection under the Act. *See TCPIP Holding,* 244 F.3d at 99 (holding that TCPIP failed to establish that "Children's Place" was a famous mark despite its use in connection with 228 retail stores in twenty-seven states generating sales in 1999 of $280 million).

*IV. GTFM's Claim for Trademark Counterfeiting*

 GTFM alleges that Solid has engaged in trademark counterfeiting in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114. Section 45 of the Act, 15 U.S.C. § 1127, defines a "counterfeit" mark as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." *Id.*

Solid's use of the number "05" and the "PLAYERS 05" trademark was not "identical with, or substantially indistinguishable from" GTFM's use of the "05" mark. Solid's sportswear was sufficiently distinguishable to preclude liability for counterfeiting. Furthermore, for much of the period in which Solid engaged in infringing conduct, the "05" mark was unregistered and thus not protectable under the anti-counterfeiting provisions of the Lanham Act.

*V. GTFM's State Law Claims*

*A. GTFM's Common Law Trademark Infringement and Unfair Competition Claims*

 GTFM's claims for trademark infringement and unfair competition under New York common law, "share[ ] many common elements with the Lanham Act claims of false designation of origin and trademark infringement, including proof of actual confusion to recover damages, and proof of a likelihood of confusion for equitable relief." *W.W.W. Pharm. Co. v. Gillette Co.,* 984 F.2d 567, 576 (2d Cir.1993) (citation omitted) (unfair competition claim). Under New York common law, "an action for [trademark] infringement as well as an action for unfair competition both require a showing that the public is likely to confuse the defendant's product or service with that of the plaintiff." *Allied Maint. Corp. v. Allied Mech. Trades, Inc.,* 42 N.Y.2d 538, 543, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). The "essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin or the goods." *Jeffrey Milstein,* 58 F.3d at 34 (citations omitted). For the reasons stated above with respect to GTFM's Lanham Act claim, and because Solid has acted in bad

faith, GTFM has also prevailed on its common law claims for trademark infringement and unfair competition with respect to Solid's use of the "05" mark.

## B. GTFM's State Law Dilution Claim

 Section 360–*l* of the New York General Business law provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. Gen. Bus. Law § 360–*l*. "New York law accords protection against dilution to marks that are distinctive as a result of acquired secondary meaning as well as to those that are inherently distinctive." *N.Y. Stock Exch., Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 557 (2d Cir.2002). Thus, GTFM's "05" trademark is eligible for antidilution protection under New York law. "Accordingly, the only question is whether there is a likelihood of dilution." *Id.*

 "Dilution under New York law can involve either blurring or tarnishment." *Id.* Blurring occurs "where the defendant uses or modifies the plaintiffs' trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiffs' product." *Deere & Co. v. MTD Prod., Inc.*, 41 F.3d 39, 43 (2d Cir.1994) (emphasis omitted). "To determine the likelihood of blurring, we have looked to six factors, including: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi)

the renown of the junior mark." *N.Y. Stock Exch.*, 293 F.3d at 558. Each of these factors has already been considered above. GTFM's use of the "05" trademark and Solid's use of the number "05" and the trademark "PLAYERS 05" are highly similar, as are the products to which their respective designations are affixed. The relevant consumer population is of only moderate sophistication. GTFM has shown defendant's predatory intent. GTFM's "05" trademark carries significant meaning in the marketplace. As a deliberate attempt at knocking-off GTFM's "05" mark, Solid's "PLAYERS 05" mark has little if any renown. Defendant's use of the number "05" as well as the trademark "PLAYERS 05" has resulted in the "diminution of the capacity of [plaintiffs'] mark [ ] to serve as a unique identifier of its products and services." *Id.*

Tarnishment occurs where a trademark is "linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiffs' unrelated goods." *Id.* at 558 (citation omitted). Because GTFM's apparel is generally of higher quality than Solid's, it is likely that GTFM's reputation has been moderately tarnished by Solid's sale of "05" apparel.

## C. GTFM's State Law Deceptive Business Practices Claim

 Section 349 of the New York General Business Law proscribes "[d]eceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. A party challenging an act or practice under Section 349 must show that: (1) defendant engaged in a consumer-oriented act, (2) that the consumer-oriented act was misleading in a material way, and (3) that

plaintiff consequently suffered injury. *See Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000); *see also Conboy v. AT & T Corp.*, 241 F.3d 242, 258 (2d Cir.2001) (citing *Stutman* for the proposition that "a Section 349 violation requires a defendant to mislead the plaintiff in some material way"). By intentionally using the "05" designation in a manner confusingly similar to GTFM's use of the "05" trademark, and causing actual confusion, Solid engaged in a consumer-oriented act that was misleading in a material way. Solid has also shown that it suffered injury in lost sales and the blurring of the distinctiveness of its "05" trademark.

## VI. Solid's Affirmative Defenses

### A. Solid's Argument that the "05" Trademark is Functional

Solid argues that GTFM's "05" mark is functional and should thus be denied protection and stricken from the Principal Register. A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (citation omitted). If the product feature is an aesthetic rather than utilitarian feature, it is appropriate also to consider whether protecting it from infringement will place competitors at a "significant non-reputation-related disadvantage." *Id.* at 33, 121 S.Ct. 1255. "[T]he burden ... falls on the defendant to prove functionality." *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1006 (2d Cir. 1995) (citation omitted).

Solid does not argue that the "05" designation "affects the cost or quality of the article" or that a grant of exclusive rights in its use will place competitors at a "significant non-reputation-related disadvantage." Rather, Solid argues that the number "05" is "essential to the use or purpose" of a sports jersey or other article of sportswear because it may function as an identifier of an athlete or perhaps the graduation class of the person who is wearing the jersey.

Neither of the hypothetical situations outlined by Solid is persuasive. If Solid's argument with respect to graduation classes is accepted, then no two digit number could be registered for clothing. GTFM's trademark only entitles it to prevent the sale of goods that unfairly invoke its goodwill. Clothing ornamented with the year of graduation does not use the year for a commercial, trademark purpose, that is, to identify the source of the garment. There is no likelihood that GTFM's use of "05" will prevent any graduating class or school, or even a clothing manufacturer that sells to schools, from marketing clothing with, for instance, the school's name or logo on the garment along with the year of graduation. Shirts that are sold to graduating classes feature the school's name and/or logo and do not use the year of graduation in a manner likely to cause confusion with GTFM's garments.[8]

Second, Solid argues that athletes will be prevented from wearing the "05" designation. GTFM has persuasively shown, however, that professional athletes rarely if ever wear two digit numbers beginning with the number zero with the exception of the combination "00." Solid could only point to one athlete in all of American professional sports who ever wore a two

---

8. While GTFM is considering suing a manufacturer that combines an ivy league college name with the mark "05" on shirts, as the trial exhibits demonstrate, these shirts have none of the indicia that would indicate they are authorized merchandise of the school whose name is used. The dominant feature in each instance is the "05."

digit number beginning with "0" and not ending in "0" and that was one baseball player who carried the number briefly in the early 1990s. Furthermore, athletes would not be precluded from wearing the number "05" because they would be doing so in a descriptive, non-trademark sense.

Moreover, the use of numbers on sports jerseys is not functional in a way that would prevent them from being used as trademarks. The numbers of famous athletes are regularly used to sell team merchandise. Solid's 1999 catalogue is littered with knockoffs of famous sports jerseys. In the unlikely event that an athlete in the future would choose to wear "05" and then would excel sufficiently in her sport to create the opportunity to market her team's jerseys with that number, then and only then, would there even be an occasion for competition between plaintiffs' mark and the athlete's mark as a designator of source. Whether there would be a likelihood of confusion in that event is impossible, and unnecessary, to determine since it would depend upon a comparison of the marks in context.

Having argued above that the GTFM's "05" mark is a weak mark entitled to only a narrow scope of protection, Solid now argues that because it is registered at the PTO in block capitals for International Class 25, the mark is entitled to an enormous scope of protection, one that excludes all other uses of the "05" number in any font or style on clothing. Solid then argues that some of the uses thus excluded are functional—that is, essential to the use or purpose of the article of clothing—with the result that the registration of "05" should be invalidated altogether. Federal registration without more does not, however, entitle GTFM's "05" mark to such a broad scope of protection. *See Jean Patou, Inc. v. Theon, Inc.,* 9 F.3d 971, 975 (Fed.Cir.1993) ("It is elementary that a registrant has rights under the statute only with respect to goods on which the trademark has been used. Trademark ownership results only from use, not from registration."). Nor does GTFM claim such a broad scope for its "05" mark. GTFM claims only the exclusive right to make a commercial use of the number "05" in any manner which denotes GTFM's goodwill. Solid has not shown that this narrow scope of protection excludes uses which Solid has called "functional," such as the use by athletes or graduation classes to identify themselves. GTFM has shown, however, that the scope of protection afforded to the "05" mark does exclude uses such as Solid's, which were clearly intended to confuse consumers.

**B. Solid's Allegations of Judicial Estoppel, Fraud and Unclean Hands**

Judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by that party in a prior legal proceeding.... A party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner.

*Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 6 (2d Cir.1999) (citations and alterations omitted). A defense of unclean hands will apply only where a party is " 'guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party.' " *Estate of John Lennon v. Screen Creations, Ltd.,* 939 F.Supp. 287, 293 (S.D.N.Y.1996) (*quoting Performance Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373, 1383 (6th Cir.1995)).

Solid argues that GTFM is judicially estopped from arguing that Solid's

use of the "PLAYERS 05" mark is confusingly similar with GTFM's use of the "05" mark because of GTFM's defense of the registration of its "05" mark in proceedings before the PTO. The PTO cited only one previously registered trademark against the application for the "05" mark, specifically, a stylized "5" mark. To show that its "05" mark could coexist with that mark, GTFM pointed out that the PTO had already determined that many other marks containing the number "5" could coexist with the stylized "5." GTFM did not argue that its "05" mark could coexist with "PLAYERS 05." GTFM did not take an inconsistent position, the PTO did not adopt an inconsistent position, and GTFM did not engage in fraud or act in bad faith.

## VII. Remedies

Pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), GTFM seeks the recovery of Solid's profits from the sale of infringing apparel, damages in the form of a trebling of its own lost profits, and attorney's fees. GTFM also seeks prejudgment interest. Pursuant to Section 35(c) of the Act, 15 U.S.C. § 1117(c), GTFM seeks statutory damages for Solid's sale of apparel bearing a counterfeit mark. Finally, GTFM seeks injunctive relief pursuant to Section 34 of the Act, 15 U.S.C. § 1116.

### A. Solid's Profits

■ "In order to recover an accounting of an infringer's profits, a plaintiff must prove that the infringer acted in bad faith." *Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir.1996); *see also Bambu Sales*, 58 F.3d at 854. Section 35(a) of the Lanham Act, 15 U.S.C. § 1117, states that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of costs or deductions claimed." "This sequence of proof ... places the burden of proving costs on the party with the superior access to such information, namely the infringing defendant." *Am. Honda Motor Co., Inc. v. Two Wheel Corp.*, 918 F.2d 1060, 1063 (2d Cir.1990). Section 35(a) further states that "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117; *see Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 109 (2d Cir.1988) ("Unlimited enhancement or reduction of an award based on defendant's profits is permitted in order to correct inadequacy or excessiveness.").

■ As noted above, GTFM has shown that Solid acted in bad faith. GTFM has also presented the more reliable evidence of Solid's sales, with detailed back-up for its calculations that Solid disputed in only a few instances. It is appropriate to include the sales of the Unknown garments for the years 1999 and 2000 and the sales for which the date of the sale could not be determined because the ability to identify style numbers and dates of sale rested exclusively with the defendant, who systematically obstructed the discovery process to prevent the plaintiffs from gathering evidence regarding the defendant's sales and profits. It would not be appropriate to use the sale of the Unknown garments in 2001, however, since in that year the sale of the Unknowns is more than double that of the confirmed "05" garments and because it appears that Solid's sales of "05" merchandise diminished over the course of the year. Solid's gross revenue is therefore $7,594,387 ($8,633,646 minus $1,039,259).

While it is appropriate to deduct from this gross revenue figure the amount Solid has shown it paid to Korean suppliers, that is, $2,290,000, Solid has failed to prove

with reliable evidence any other expenses. Consequently, Solid's profits from its infringing sales are $5,304,387.

While the gross revenue figure is likely an understatement, the expense deduction is also an understatement. In these circumstances, this award of the defendant's profits is neither inadequate nor excessive.

## B. GTFM's Damages

 GTFM also seeks its lost profits. "Our case law is well settled that in order for a Lanham Act plaintiff to receive an award of damages the plaintiff must prove either actual consumer confusion or deception resulting from the violation, or that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion." *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 493 (2d Cir.1998) (citation omitted, ellipsis in original). Recovery of damages to an injured plaintiff may include compensation for lost sales and harm to market reputation. *Int'l Star Class*, 80 F.3d at 753. Lost profits are calculated by estimating revenue lost due to the infringing conduct and subtracting what it would have cost to generate that revenue. *Cf. Murphy Door Bed, Co. v. Interior Sleep Systems, Inc.*, 874 F.2d 95, 103 (2d Cir.1989) ("in computing plaintiff's lost profits for copyright infringement award, costs necessary to generate the income should be deducted from sales revenue" (citation omitted)).

Section 35(a) of the Lanham Act provides that "[i]n assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1115(a). Equitable considerations should guide any decision to treble a damage award. *See Chanel, Inc.*

*v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir.1991).

GTFM has shown actual consumer confusion through Nadav's testimony. It has also shown that Solid's actions were intentionally deceptive.

It is difficult to determine how many units of apparel GTFM might have sold but for Solid's infringing conduct. In such a situation, the Court may engage in limited speculation in calculating damages. *See PPX Enter., Inc. v. Audiofidelity Enter., Inc.*, 818 F.2d 266, 271 (2d Cir.1987).

GTFM has shown that it would have made $4,258,378 in profits if it had sold each of the garments from which Solid's profits have been calculated.[9] $1,419,459, or one-third of this amount, is a fair and reasonable approximation of GTFM's lost profits. Although GTFM has certainly shown that Solid's infringement was willful, given the size of the award based on Solid's profits, the uncertainty regarding the number of lost sales, and the fact that certain sales may have been made in 2001 without actual notice to Solid of GTFM's registration of the "05" mark, the Court declines to treble the award.

## C. Attorney's Fees

Pursuant to 15 U.S.C. § 1117(a), a court may award "reasonable attorney fees" to the prevailing party in "exceptional" circumstances. " 'Exceptional' circumstances include willful infringement." *Bambu Sales*, 58 F.3d at 854; *see also Int'l Star Class*, 80 F.3d at 753; *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 166 F.3d 438, 439 (2d Cir.1999) (per curiam) (attorney fees should be awarded under 15 U.S.C. § 1117(a) "only on evidence of fraud or bad faith").

Solid engaged in willful infringement. If defendant's bad faith alone were not sufficient to make this an exceptional case,

---

**9.** This figure excludes 2001 sales of the Unknown garments.

its continued sales between March and November 2001, its conduct during discovery, and its perjury during deposition and at trial make this an exceptional case. GTFM is entitled to reasonable attorney's fees. GTFM shall submit an application, properly supported, for the amount of its fees and costs within two weeks of the date of this Opinion. The defendants shall submit any opposition to the amount requested within two weeks of the plaintiffs' submission.

### D. GTFM's Failure to Provide Notice of Registration

Pursuant to Section 29 of the Lanham Act, 15 U.S.C. § 1111, Solid argues that GTFM may not collect any profits or damages because it failed to display on its apparel statutory notice of the federal registration of the "05" mark. Section 29 provides, in pertinent part:

[A] registrant of a mark registered in the Patent and Trademark Office, may give notice that his mark is registered by displaying with the mark the words "Registered in U.S. Patent and Trademark Office" or "Reg. U.S. Pat. & Tm. Off." or the letter R enclosed within a circle, thus (R); and *in any suit for infringement under this chapter by such a registrant failing to give such notice of registration, no profits and no damages shall be recovered under the provisions of this chapter unless the defendant had actual notice of the registration.*

(15 U.S.C. § 1111) (emphasis supplied).

For any infringement occurring before December 26, 2000, the registration date of the "05" mark, GTFM may recover profits and damages under the provisions of Section 35 of the Act which apply to unregistered marks. *See* 15 U.S.C. 1117(a) (profits, damages, and costs recov-

erable for "a violation under section 1125(a) . . . of this title"). For all infringement occurring after December 26, 2000, however, GTFM must either have displayed statutory notice of the registration of the "05" mark or prove that Solid had actual notice of that registration in order to recover profits and damages. 15 U.S.C. § 1111.

The parties do not dispute that since the date of registration of the "05" mark, GTFM has not displayed statutory notice of the registration of the "05" mark on the apparel at issue in this case. Similarly, they do not dispute that Solid had actual notice of the registration since at least March 7, 2001, when Solid received notice that GTFM had moved before the PTO for entry of a default when Solid did not respond to GTFM's opposition to Solid's registration of "PLAYERS 05." Solid continued selling "05" garments until at least November 2001.

The parties do dispute, however, whether Solid had actual notice between December 26, 2000 and March 7, 2001. GTFM relies on the evidence that the PTO mailed notice of GTFM's opposition to Solid's application to register "PLAYERS 05" on November 14, 2000. It appears that the notice was received by Solid's trademark counsel.

The awards made above include figures based on sales of 35,963 garments in 2001.[10] These 2001 sales resulted in an award of approximately $322,623 for Solid's profits ($460,023 in gross revenues minus $137,400 or 6% of $2,290,000, which is the total amount Solid has shown that it paid to its Korean suppliers of the garments).[11] Those sales resulted in an award of approximately $107,541 (one-third of $322,623) for GTFM's lost profits. Together, this represents an award for

---

**10.** There were *de minimis* sales in the year 2000 after December 26, 2000.

**11.** The 2001 revenue of $460,023 is 6% of the total revenue of $7,594,387.

garments sold in 2001 of $430,164. Roughly 55% or $236,590 of $430,164 represents the sales that probably occurred in 2001 before March 7, 2001.[12] It is unnecessary to reduce the award of damages already made since the dispute regarding actual notice during the weeks in 2001 before March 7 has already been considered in determining the amount to award for Solid's profits and plaintiffs' lost profits.

### E. Prejudgment Interest

█ "Although Section 1117(a) does not provide for prejudgment interest, such an award is within the discretion of the trial court and is normally reserved for 'exceptional' cases." *Am. Honda*, 918 F.2d at 1064. In light of Solid's willful intent to profit illegally from the goodwill of GTFM's "05" brand, prejudgment interest is appropriate in this case. The plaintiffs will submit their request and any support for their request within two weeks of the date of this Opinion. Defendant's opposition is due within two weeks thereafter.

### F. Statutory Damages

Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c), provides for the award of statutory damages "[i]n a case involving the use of a counterfeit mark." Because Solid's use of the "05" designation did not constitute a counterfeit use, statutory damages are not available to GTFM under the Act.

### G. Injunctive Relief

█ GTFM seeks a permanent injunction prohibiting Solid from making any unauthorized use of GTFM's trademarks and trade dress and directing that Solid deliver for destruction all infringing merchandise. Upon a finding of trademark infringement, a district court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116. Whether a permanent injunction should issue and what its proper scope should be are issues that ultimately depend upon a careful balancing of the total equities in a case, including, but not limited to, the basic fact of infringement. *See Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 737 (2d Cir. 1991).

> [A] court may, after equitably balancing the conflicting interests of the parties involved, either determine that no injunctive relief would be appropriate, or tailor such relief so as to avoid confusion in the marketplace, protect a prior company's property interest in its name, and permit an individual to exploit his own identity and reputation in a legitimate manner.

*Id.*

The equities clearly favor the granting of injunctive relief to GTFM with respect to its "05" trademark. GTFM shall submit within two weeks of the date of this Opinion an appropriate Order. Solid shall have two weeks thereafter to present any objection to the terms of the proposed Order.

### Conclusion

For the foregoing reasons, the Court finds that Solid has engaged in intentional

---

**12.** This rough estimate is guided by both parties' statements that the bulk of Solid's 2001 sales occurred early in the year as well as by a rudimentary review of GTFM's spreadsheet of Solid's 2001 sales invoices. Of the 55 pages of GTFM's spreadsheet that record in chronological order each of the 2001 invoices that the plaintiffs used to compute damages, 30 pages reflect sales before March 6, 2001.

Thirty is approximately 55% of fifty-five. While these entries reflect sales of garments in addition to those known to bear an "05," and represent sales of varying quantities of clothing, it is not unreasonable to use this calculation to estimate the pre-March 7 sales, particularly where, as here, the parties have failed to provide the Court with any more accurate means of assessing the sales at issue.

trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114, false designation of origin in violation of Section 43(a) of the Act, 15 U.S.C. § 1125(a), common law trademark infringement and unfair competition, and the violation of New York General Business Law Sections 360–*l* and 349, for which the Court awards GTFM $5,304,387 representing Solid's profits for its infringing sales and $1,419,459 representing GTFM's lost profits, for a total of $6,723,846. A verdict is given for the defendant on the plaintiff's remaining claims.

GTFM's motion to preclude certain evidence is denied. A verdict is rendered in favor of the plaintiffs on Solid's counter-claim seeking the cancellation of GTFM's registration of the "05" trademark.

GTFM shall submit within two weeks of the date of this Opinion an application for the amount of its fees and costs, a request for prejudgment interest, and an appropriate Order of injunction. Solid shall submit any opposition to that submission within two weeks of plaintiffs' submission.

SO ORDERED.