THE DEAL, LLC, Plaintiff,

v.

KORANGY PUBLISHING, INC., Defendant.

No. 03 Civ. 8119(SAS).

United States District Court, S.D. New York.

Jan. 21, 2004.

---

Sean E. O'Donnell, Robert Alan Johnson, Akin Gump Strauss Hauer & Feld LLP, New York, NY, Jordan A. La Vine, Akin Gump Strauss Hauer & Feld LLP, Philadelphia, PA, for Plaintiff.

Jennifer Meredith, Dariush Keyhani, Meredith & Keyhani, PLLC, New York, NY, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

The Deal, LLC ("The Deal") brings this action alleging unfair competition and infringement of its registered trademarks, THE DAILY DEAL and THE DEAL (collectively THE DEAL MARKS) through Korangy Publishing, Inc.'s ("Korangy Publishing") publication of *The Real Deal*.[1] The Deal now moves to preliminarily enjoin Korangy Publishing's use of the phrase "The Real Deal" or any other re-

1. I will use the following typeface conventions to differentiate between the parties, the trade-

production or colorable imitation of THE DEAL MARKS in connection with print or online publications. The Deal also seeks to recall informational, promotional, and other materials bearing the words "The Real Deal." For the reasons set forth below, plaintiff's motion is denied in its entirety.

## I. BACKGROUND

### A. Procedural Background

On October 14, 2003, The Deal filed a Complaint alleging trademark infringement and unfair competition under the Lanham Act. One month later, The Deal moved for a preliminary injunction.[2] The motion was fully briefed on January 5, 2004, and an evidentiary hearing was held on January 9 and January 12, 2004.[3]

### B. The Parties

The Deal is a national, "diversified media company" established in March 2000 to provide "financial news, commentary, data, and services to corporate and financial

dealmakers, their advisors and investors worldwide"[4] through print and on-line media, e.g., The Deal (a newsweekly), The Daily Deal (a daily financial newspaper), and TheDeal.com (containing information taken from The Deal's print publications).[5] Korangy Publishing is a publishing company established in April 2003. Its principal business is the publication of a monthly magazine, The Real Deal, which contains information about the New York City real estate market and is available on newsstands and by subscription.[6] Korangy Publishing also maintains an Internet site containing information drawn from The Real Deal.[7]

### C. The Dispute

The Deal has several trademarks, including THE DAILY DEAL and THE DEAL, which it alleges Korangy Publishing infringed by its publication of The Real Deal.[8] The Deal registered the trademarks THE DAILY DEAL and THE DEAL on January 23, 2001 and May 13, 2003, respectively.[9]

---

marks, and the publications. I will refer to the parties as Korangy Publishing and The Deal; the trademarks as THE DEAL and THE DAILY DEAL; and the publications as The Deal, The Daily Deal, and The Real Deal.

2. See 10/14/03 Complaint ("Compl."); 11/14/03 Notice of Motion for Preliminary Injunction ("Pl. Notice of Motion").

3. The transcripts from the hearing are referred to throughout this opinion as "1/9 Tr." and "1/12 Tr."

4. Compl. ¶ 8. The Deal has offices in New York, San Francisco, Washington D.C., and London. See 1/12 Tr. at 62 (statement of Kevin Worth, The Deal's President, Founder, and CEO).

5. See Compl. ¶¶ 8–9.

6. See Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction ("Def.Mem.") at 8.

7. See http://www.therealdeal.net.

8. The Deal has registered the following marks: (1) THE DAILY DEAL (U.S. Registration No. 2,422,734), (2) THE DEAL (U.S. Registration No. 2,716,175), (3) DEAL DIARY (U.S. Registration No. 2,521,361), (4) CHARTING THE DEAL ECONOMY (U.S. Registration No. 2,672,830), and (5) DEALCAST (U.S. Registration No. 2,672,830). See Plaintiff's Memorandum of Law in Support of Its Motion for Preliminary Injunction ("Pl.Mem.") at 3. Registration of several additional DEAL-related marks is pending.

9. See id. THE DAILY DEAL was registered for use in connection with "publications, namely, newspapers and magazines pertaining to the financial and legal fields" and for a website/online publications featuring information in the financial and legal fields. THE DEAL was registered for use in the same fields. Trademark Electronic Search System Records for THE DEAL MARKS, Ex. B to 11/11/03 Declaration of Kevin Worth, Ex. 1 to Pl. Notice of Motion; Plaintiff's Exhibit ("Pl. Ex.") 15.

The Deal uses these trademarks in connection with its two primary publications—*The Deal* and *The Daily Deal*. The Deal is a tabloid-size glossy, color magazine with the word "Deal" in bright red lettering. Spanning the cover of each edition is a single image, such as a color photograph or illustration relating to the lead story.[10] The cover page of *The Daily Deal* is primarily black and white, featuring numerous text stories and small black-and-white photographs on the front cover.[11] The Deal primarily circulates its publications through subscriptions and online sales, rather than newsstands.[12] *The Deal* has approximately 40,000 subscribers and *The Daily Deal* has approximately 5,000 subscribers.[13] The so-called "Deal Community" of consumers includes corporate executives, deal advisors (*e.g.*, bankers, corporate lawyers, mortgage brokers), and institutional investors.[14] The Deal alleges that its publications "regularly contain articles concerning the real estate market."[15]

The Deal claims that on December 16, 2002, Korangy Publishing's principal and publisher, Amir Korangy, visited The Deal's New York City headquarters and spoke with Richard Siler, an advertising salesperson with The Deal.[16] The parties characterize Korangy's conduct differently. According to The Deal, Korangy posed as a potential advertiser—an agent from The Corcoran Group—to hoodwink Siler, thereby obtaining valuable marketing information about The Deal.[17] Korangy, by contrast, asserts that he was simply trying to "see how other trade magazines promote[ ] advertising for placement within their publications and to ensure that The Deal did not have a real estate angle and would be an inappropriate forum for Real Estate Advertisers."[18] Neither party denies that Korangy was given a media kit containing "various information on The Deal's publi-

10. *See, e.g., The Deal*, Sept. 8, 2003 (full cover illustration of three progressively smaller fish swallowing each other to signify the new age of M & A), Pl.Ex. 1; *The Deal*, Jan. 12, 2004 (full cover photograph of Harvey Miller); *The Deal*, Jan. 5, 2004 (full cover illustration incorporating photos of three businessmen), Pl. Ex. 14.

11. *See, e.g., The Daily Deal*, Aug. 5, 2003, Pl.Ex. 2; *The Daily Deal*, Jan. 12, 2004, Pl.Ex. 25.

12. 1/12 Tr. at 88 (statement of Kevin Worth).

13. *Id.* at 86 (statement of Kevin Worth). Worth explains that the true indicator of readership is measured by "how many [pairs of] eyeballs" view the magazine. He estimates that the "pass along factor" is approximately 2.5 times, meaning that the actual readership is estimated at greater than 150,000.

14. *See id.* at 87 (statement of Kevin Worth).

15. Pl. Mem. at 3. The Deal presented a number of articles as Plaintiff's Exhibits 12 and 13 during the hearing in support of this statement.

16. *See* 12/11/03 Declaration of Richard Siler, Advertising Sales Manager for The Deal, in Support of Motion for Preliminary Injunction ("Siler Decl.") ¶ 3, Ex. 3 to Pl. Notice of Motion.

17. *See* Plaintiff's Reply Memorandum of Law in Support of Its Motion for Preliminary Injunction ("Pl. Reply Mem.") at 2; 1/12 Tr. at 207 (statement of Robert Johnson, The Deal's counsel). The Corcoran Group is a national real estate company. *See* http://www .corcorangroup.com/. Korangy allegedly presented Siler with a business card from The Corcoran Group, which is not surprising, as Korangy was employed by The Corcoran Group. *See* 12/9/03 Declaration of Amir Korangy, Korangy Publishing's Founder and Publisher ("Korangy Decl.") ¶ 3.

18. *See* Korangy Decl. ¶ 8; 1/12 Tr. at 112 (statement of Amir Korangy); *see also id.* ¶ 9 ("I felt even more confident after my meeting with Mr. Siler that not only were the names different, but that The Deal did not cater to any sort of Real Estate Professional and in particular to professionals interested in New York Real Estate.").

cations, including samples of the publications themselves, advertising rates, and other pertinent information."[19] When Siler contacted Korangy two weeks later, Korangy allegedly informed him that he had opted to advertise in smaller real estate publications.[20]

In April 2003, Korangy Publishing began to distribute a monthly magazine entitled *The Real Deal. The Real Deal* is a tabloid-size glossy, color magazine. The word "Real" in the title appears in italics and the words "New York Real Estate" appear in red lettering below the title. The cover page depicts a combination of text stories and photographs.[21] *The Real Deal* is sold on newsstands and includes among its primary audience "brokers, attorneys, agents, developers, accountants, financiers and real estate executives."[22]

The Deal's employees first became aware of *The Real Deal* in July 2003.[23] The Deal then sent three letters to Korangy Publishing asking it to "reconsider" its use of allegedly similar marks. Because Korangy Publishing declined to stop using that name, The Deal commenced the instant action in October.[24] The Deal contends that Korangy Publishing misappropriated elements of THE DEAL MARKS and that the "overall presentation of Korangy's 'The Real Deal' mark and the masthead for its publication incorporates elements long used by The Deal, including prominent use of a particular shade of red in its publications and website content."[25] The Deal also submits that the topics addressed in *The Real Deal* are "substantially similar" to those topics covered in *The Daily Deal* and *The Deal*.[26] Finally, The Deal alleges that the publications share the same readership.[27]

## II. ANALYSIS

### A. Legal Standard

A preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies"[28] and should not be routinely granted.[29] To obtain a preliminary injunction, a party must demonstrate (1) probability of irreparable harm in the absence of injunctive relief and (2) either a likelihood of success on the merits of the claim, or a "serious question going to the merits and a balance of hardships tipping decidedly in [plaintiff's] favor."[30]

---

19. Siler Decl. ¶ 2; *see also* Media Kit, Pl.Ex. 11.

20. Siler Decl. ¶ 5.

21. *See, e.g., The Real Deal*, Oct. 2003, Pl.Ex. 20; *The Real Deal*, July 2003, Pl.Ex. 10; *The Real Deal*, Sept. 2003, Pl.Ex. 21; *The Real Deal*, Aug. 2003, Pl.Ex. 22.

22. www.therealdeal.net/rates.php.

23. *See* Siler Decl. ¶ 3.

24. *See* Pl. Mem. at 7. The letters were sent on August 4, September 16, and October 3 of 2003. *See* 8/4/03 Letter to Korangy from Louis Willacy, The Deal's Vice President of Business & Legal Affairs, Ex. F to Pl. Notice of Motion; 9/16/03 Letter to Jennifer Meredith, Korangy Publishing's counsel, from Jordan La Vine, The Deal's counsel, Ex. G to Pl. Notice of Motion; 10/3/03 Letter to Meredith from La Vine, Ex. G to Pl. Notice of Motion.

25. Pl. Mem. at 6.

26. *Id.*

27. *See id.* at 7 (stating that Korangy Publishing targets law firms, financiers, and mortgage brokers and that The Deal targets investors, financiers, executives, and their advisors).

28. *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir.1985).

29. *See Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

30. *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 145 (2d Cir.2003) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam) and *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1038 (2d Cir.1992)).

"In an action for trademark infringement, where a mark merits protection, a showing that a *significant* number of consumers are likely to be confused about the source of the goods identified by the allegedly infringing mark is *generally* sufficient to demonstrate both irreparable harm and a likelihood of success on the merits." [31] Thus, in deciding whether to issue a preliminary injunction in a trademark infringement action, the central questions before the court are (1) whether the plaintiff has a valid mark entitled to protection and (2) whether the defendant's alleged infringement is likely to cause confusion among consumers.[32]

### B. Delay

As an initial matter, any "presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief." [33] "Though such delay may not warrant the denial of ultimate relief, it may, standing alone, ... preclude the granting of preliminary injunctive relief, because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief

and suggests that there is, in fact, no irreparable injury." [34]

Korangy Publishing argues that The Deal delayed filing its lawsuit: "Defendant published their magazine in April of 2003, yet the Plaintiff failed to bring the instant action until October 14, 2003." [35] The Deal offers a reasonable explanation for the delay, suggesting that it did not learn of *The Real Deal* until July, and during the ensuing months sent letters in an attempt to avoid litigation. But The Deal acknowledges that it failed to seek injunctive relief when it filed the Complaint, instead filing that motion approximately four weeks later (on November 14, 2003).[36] While plaintiff's delay in seeking relief informs the question of whether The Deal has suffered irreparable harm, the delay is not so lengthy as to *require* denial of the motion.

### C. Trademark Infringement

The Deal brings this action under sections 32(1) and 43(a) of the Lanham Act.[37] Section 32(1) governs claims for infringement of a registered trademark, prohibiting the use in commerce of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connec-

---

31. *Virgin Enters.*, 335 F.3d at 146 (emphasis added).

32. *See id.; New Kayak Pool*, 246 F.3d at 185; *Bristol–Myers*, 973 F.2d at 1038; *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F.Supp.2d 273, 293 (S.D.N.Y.2002).

33. *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir.1995); *see also Brockmeyer v. The Hearst Corp.*, No. 01 Civ. 7746, 2002 WL 1402320, at *4–5 (S.D.N.Y. June 27, 2002). The Deal's argument that delay is "irrelevant," is incorrect. *See* Pl. Reply Mem. at 1 n. 1. In *Virgin Enterprises*, the court found that proof of likelihood of confusion is "*generally* sufficient to demonstrate both irreparable harm and a likelihood of success on the merits." 335 F.3d at 146 (emphasis added). But the Second Circuit has also stated

that "any such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief," *Tough Traveler*, 60 F.3d at 968. This is true "unless the plaintiff is unaware of the severity of the infringement or the delay is attributable to the plaintiff's good faith efforts to investigate the infringement." *Brockmeyer*, 2002 WL 1402320, at *5.

34. *Tough Traveler*, 60 F.3d at 968 (quotation marks and citations omitted).

35. Def. Mem. at 8.

36. 1/9 Tr. at 15 (statement of Robert Johnson).

37. 15 U.S.C. §§ 1114(1), 1125(a).

tion with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."[38] Section 43(a) "guards against infringement of unregistered marks and other indicia of origin, including trade dress and trade names."[39] "A claim of trademark infringement whether brought under 15 U.S.C. § 1114(1) ... or 15 U.S.C. § 1125(a) ..., is analyzed under the familiar two-prong test...."[40] *First*, courts consider whether the plaintiff has a valid mark entitled to protection. *Second*, courts query whether the defendant's alleged infringement is likely to cause confusion among consumers.[41]

### 1. Validity

■■■ "To be valid and protectable, a mark must be capable of distinguishing the products it marks from those of others."[42] For purposes of trademark protection, marks are classified in five categories: generic, descriptive, suggestive, arbitrary, and fanciful.[43] As the Second Circuit has explained:

> A mark is generic if it is a common description of products and refers to the genus of which the particular product is

a species. A mark is descriptive if it describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put. A mark is suggestive if it merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods. An arbitrary mark applies a common word in an unfamiliar way. A fanciful mark is not a real word at all, but is invented for its use as a mark.[44]

"A mark is entitled to protection when it is inherently distinctive," that is, arbitrary, fanciful, or suggestive.[45] On the other hand, if the mark is " 'merely descriptive,' 15 U.S.C. § 1052(e), it qualifies for protection only if it has acquired secondary meaning...."[46] Generic marks are not entitled to trademark protection.[47] The classification of a mark requires the factfinder to determine "how the purchasing public views the mark."[48]

■■■ Registration of a mark with the United States Patent and Trade Office ("PTO") is "prima facie evidence that the mark is ... valid (*i.e.*, protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce."[49] While not dis-

---

38. 15 U.S.C. § 1114(1).

39. *Clinique Labs., Inc. v. Dep Corp.*, 945 F.Supp. 547, 550 (S.D.N.Y.1996).

40. *Virgin Enters.*, 335 F.3d at 146.

41. *See id.; New Kayak Pool*, 246 F.3d at 185; *Bristol–Myers*, 973 F.2d at 1038; *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F.Supp.2d 273, 293 (S.D.N.Y.2002).

42. *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir.1999).

43. *See id.* ("The categories reflect both the eligibility for protection and the degree of protection accorded.").

44. *Id.*

45. *Id.*

46. *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 117 (2d Cir.1999) (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir.1995)).

47. *See Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir.1997).

48. *Lane Capital Mgmt.*, 192 F.3d at 344.

49. *Id.* at 337; *see also* 15 U.S.C. § 1115(a). After five consecutive years of registration, the validity of a mark is incontestable. *See* 15 U.S.C. § 1065.

positive evidence of validity, the registration of a trademark "confers a procedural advantage on the registrant in an infringement action: the opposing party must overcome the presumption that the purchasing public perceives the mark to be inherently distinctive." [50] Thus, "when a plaintiff sues for infringement of its registered mark, the defendant bears the burden to rebut the presumption of [the] mark's protectability by a preponderance of the evidence." [51]

Korangy Publishing contends that The Deal's marks are "generic and are therefore unenforceable or, in the alternative, descriptive and unenforceable because there is insufficient proof to substantiate secondary meaning within the marketplace." [52] The Deal counters that its marks are not generic because they (1) are federally registered and (2) "suggest a double meaning [requring consumers to] make multiple inferential steps from the marks themselves before arriving at a conclusion about the nature of the publications." [53] Specifically, Plaintiff argues that "The Deal" refers both to a financial transaction or "the commonly used phrase here's the deal, or what's the deal with

that, meaning the inside scoop, or the inside story." [54]

Because THE DEAL MARKS are federally registered marks, they are entitled to a presumption of validity,[55] but Korangy Publishing can rebut this presumption by demonstrating that the purchasing public fails to view the mark as inherently distinctive. Neither party argues that THE DEAL MARKS are arbitrary or fanciful. Accordingly, the question before the court is whether the marks are generic, descriptive (and if so, whether secondary meaning has attached), or suggestive. Korangy Publishing's argument that the terms THE DEAL and THE DAILY DEAL are generic lacks merit for rather obvious reasons. A generic term is a "common name, like automobile or aspirin, that describes a kind of product," [56] but THE DEAL and THE DAILY DEAL are not common names used synonymously with the word "newspaper," "magazine," or even "publication." Nor are THE DEAL MARKS "descriptive" of the product. A descriptive mark "may point to a product's intended purpose, its function or intended use, its size, or its merit." [57] For instance, the mark "1–800–PLUMBING" was found

---

**50.** *Lane Capital Mgmt.*, 192 F.3d at 337. It should be noted that "[e]ven the presumption of validity arising from federal registration cannot protect a mark that is shown on strong evidence to be generic as to the relevant category of products prior to the proprietor's trademark use and registration." *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 811 (2d Cir.1999). But, even if the words in a trademark are deemed generic, the combination of generic words with distinctive coloring, lettering, or other design elements may create a legally protectable mark. *See Courtenay Communications Corp. v. Hall*, 334 F.3d 210, 215–16 (2d Cir.2003) ("[E]ven if the words 'Marketing News' are generic, CCC may nonetheless be entitled to trademark protection for its composite mark as a whole. There are many examples of legally protected marks that combine generic words with dis-

tinctive lettering, coloring, or other design elements.").

**51.** *Lane Capital Mgmt.*, 192 F.3d at 345.

**52.** Def. Mem. at 1.

**53.** Pl. Reply Mem. at 5.

**54.** 1/12 Tr. at 199 (statement of Robert Johnson).

**55.** *See Lane Capital Mgmt.*, 192 F.3d at 337. THE DEAL MARKS are not, however, incontestable as THE DEAL and THE DAILY DEAL have been registered for fewer than five years.

**56.** *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir.1993).

**57.** *Id.* at 1076.

to be descriptive "as immediately conveying the impression that a particular plumbing service is available by calling the telephone number." [58] But the words THE DEAL and THE DAILY DEAL do not immediately convey to the purchaser that the product is a news publication dedicated to the coverage of financial and legal news in the same way that descriptive marks such as CHAPSTICK and HOLIDAY INN "directly suggest the relevant products." [59] Although THE DEAL MARKS tread the line between "descriptive" and "suggestive," I conclude that these are suggestive, meaning that they suggest the product, but may require some imagination to "grasp the nature of the product." [60] Accordingly, because Korangy Publishing has failed to rebut the presumption of validity created by registration, THE DEAL MARKS are valid marks, entitled to protection.

## 2. Likelihood of Confusion

■ "In determining a likelihood of confusion, it has long been the practice of this Circuit to apply the multi-factor balancing test articulated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.1961)." [61] *Polaroid* identified eight nonexclusive factors that are pertinent in addressing likelihood of confusion: [62] (1) the strength of the plaintiff's mark; (2) the similarity of defendant's mark to plaintiff's; (3) the proximity of the products sold under defendant's mark to those sold under plaintiff's; (4) where the products are different, the likelihood that plaintiff will "bridge the gap" by selling the products being sold by defendant; (5) the existence of actual confusion among consumers; (6) the sophistication of consumers; (7) whether defendant acted in bad faith in adopting the mark; and (8) quality of the defendant's product. [63] The first six factors deal directly with the likelihood of consumer confusion, whereas the last two factors—quality of defendant's product and defendant's bad faith in adopting the mark—address the issues of harm to plaintiff's reputation and remedy. [64] "No single Polaroid factor is pre-eminent, nor can the presence or absence of one without analysis of the others, determine the outcome of an infringement suit." [65]

■ Although application of the *Polaroid* test is not "rigid, it is nevertheless 'incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why.'" [66] However, the *Polaroid* factors are "merely tools 'designed to help grapple with the "vexing" problem of resolving the likelihood of confusion issue,' and [ ] 'the ultimate conclusion as to whether a likelihood of confusion exists is not to be determined in accordance with some rigid formula.'" [67]

**58.** *Cline v. 1–888–PLUMBING Group,* 146 F.Supp.2d 351, 363 (S.D.N.Y.2001).

**59.** *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 75 (2d Cir.1988).

**60.** *Gruner + Jahr USA Publ'g,* 991 F.2d at 1076.

**61.** *New Kayak Pool,* 246 F.3d at 185; *see also Virgin Enters.,* 335 F.3d at 146; *Nikon Inc. v. Ikon Corp.,* 987 F.2d 91, 94 (2d Cir.1993).

**62.** *See Polaroid,* 287 F.2d at 495.

**63.** *See id.; see also Virgin Enters.,* 335 F.3d at 146–47.

**64.** *See Virgin Enters.,* 335 F.3d at 147, 151.

**65.** *Thompson Med. Co. v. Pfizer Inc.,* 753 F.2d 208, 214 (2d Cir.1985).

**66.** *New Kayak Pool,* 246 F.3d at 185 (quoting *Arrow Fastener Co.,* 59 F.3d at 391).

**67.** *Bristol–Myers,* 973 F.2d at 1044 (quoting *Lois Sportswear v. Levi Strauss & Co.,* 799 F.2d 867, 872 (2d Cir.1986)) (citations and quotations omitted).

### a. Strength of Plaintiff's Marks

■ "The strength of a trademark encompasses two different concepts, both of which relate significantly to likelihood of consumer confusion."[68] The first is the trademark's inherent strength, or "inherent distinctiveness," the second is its "acquired distinctiveness," or the "fame, or the extent to which prominent use of the mark in commerce has resulted in a high degree of consumer recognition."[69]

■ As to the first measure of strength—inherent distinctiveness—the law provides "broad, muscular protection" to arbitrary or fanciful marks and "lesser protection, or no protection at all to marks consisting of words that identify or describe the goods or their attributes."[70] The second measure of strength, that of source identification, is assessed by "the extent to which prominent use of the mark in commerce has resulted in a high degree of consumer recognition."[71] Acquired distinctiveness generally relates to the fame of a mark that has been prominently used in connection with a particular area of commerce for a long time. Of course, "[t]he use of part or all of the mark by third parties [, which] weakens its overall strength."[72]

■ THE DEAL MARKS are not particularly strong. While THE DEAL MARKS are suggestive marks, The Deal has failed to demonstrate that its marks have acquired a high degree of consumer recognition. Notably, the marks have not been in use for a long time—THE DEAL mark was filed on July 21, 2000 and THE DAILY DEAL mark was filed on March 25, 1999.[73] Moreover, it is indisputable that the words "the" and "deal" are not particularly distinctive in the marketplace and, contrary to The Deal's protestations, there is evidence that the words "the" and "deal" are used in connection with both online and print publications and with other unrelated products.[74] Accordingly, this

---

68. *Virgin Enters.*, 335 F.3d at 147.

69. *Id.*

70. *Id.* "In somewhat circular fashion, consideration of this factor includes an evaluation of the same characteristics that initially determined a mark's validity: inherent distinctiveness, descriptiveness, and secondary meaning." *Time, Inc.*, 173 F.3d at 117.

71. *Virgin Enters.*, 335 F.3d at 147.

72. *Time, Inc.*, 173 F.3d at 118; *see also Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir.1998); *Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 581 (2d Cir. 1991) ("[E]xtensive third party use of the words 'Choice' and 'Choices' weighs against a finding that Lang's trade name is strong.").

73. *See* Pl.Ex. 15. As noted earlier, the marks were registered more recently. *See supra* note 9 and accompanying text.

74. The Deal correctly points out that Korangy Publishing's analysis is deficient because it includes trademarks incorporating the word "deal" whose registration has *lapsed*. *See* Pl.

Reply Mem. at 4. But this does not end the inquiry. As the *Streetwise Maps* court noted,

> Other map manufacturers have used the word "street" in their product's names. For example, Rand McNally publishes a book of maps under the name, "StreetFinder," and other map-related products include "Streetmate" and "Streetscene." Moreover, a trademark search revealed the extensive use of the words "street" and "wise" in names registered by manufacturers of other products. Such third party use of the words "street" and "wise" weakens the strength of Streetwise's mark.

159 F.3d at 744. This suggests that the strength of THE DEAL MARKS is weakened by current third party use of the word "deal" in connection with either financial or legal publications, as well as with other unrelated products. Thus, the portion of the trademark search conducted by defendant's counsel revealing the *current* use of the term "deal" in connection with various products is relevant to the issue of strength of the marks.

In addition, the recent third-party use of the words "The" and "Deal" by presidential hopeful John Kerry cannot have escaped The Deal's watchful eye. Kerry has apparently

factor tips slightly in favor of Korangy Publishing.

### b. Similarity Between THE DEAL MARKS and *The Real Deal*

■ "When the secondary user's mark is not identical but merely similar to the plaintiff's mark, it is important to assess the degree of similarity between them in assessing the likelihood that consumers will be confused." [75] In evaluating this factor, a court must consider " 'all factors that could reasonably be expected to be perceived by and remembered by potential purchasers ... [including the] context in which the respective marks are generally presented.' " [76]

■ The Deal argues that THE DEAL, THE DAILY DEAL, and the phrase "The Real Deal" represent "nearly identical marks" and that "Korangy has misappropriated [ ] 'The Deal' mark *in its entirety* and has misappropriated two of the three terms in The Deal's 'The Daily Deal' mark." [77] The Deal further contends that "what defendant has done is appropriated a shade of red used in its publication [that is] strikingly similar to that used by plaintiff and the slight differences in stylization have little relevance because the publications are not sold side by side. So

these minimal differences in logo stylization would not likely remain with readers...." [78] Korangy Publishing counters by pointing out the differences between the publications, noting that the title of *The Real Deal* "is in Impact font, 'Real' is italicized, letters of the title are in black, all capitals, and also has 'New York Real Estate' written in capitals [79] right below the title." [80] On the other hand, the title of The Deal publications are "written in Times New Roman font, letters are in bright red and are not capitals." [81]

A visual comparison of the publications makes clear that *The Daily Deal*, printed on newsprint, lacks the same look and feel of *The Deal* and *The Real Deal*, although the word "Deal" is presented in large red letters. Thus, I will focus on the similarities between *The Deal* and *The Real Deal*. These publications are unlikely to appear similar to the purchasing public. The titles are printed in different fonts, sizes, and colors. Moreover, the layouts of the publications' covers are significantly different. While *The Deal* prints a single thematic image spanning the cover page, *The Real Deal* combines colorful images and text stories in a more cluttered display. Finally, although both publications appear to be printed on glossy, colored paper of similar weight, this is not uncommon for news magazine publications.[82] Moreover, The

---

embraced the slogan, adopting a logo centering on the term "The Real Deal" printed in bright red letters; dubbing his bus tour, the "Real Deal Express Bus Tour"; and referring to his blueprint for America as "The Real Deal." *See* http://www.johnkerry.com/.

75. *Virgin Enters.*, 335 F.3d at 149; *see also Arrow Fastener*, 59 F.3d at 394; *Bristol–Myers*, 973 F.2d at 1046.

76. *Arrow Fastener*, 59 F.3d at 394 (quoting *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1133 (2d Cir.1979), *abrogated on other grounds, Bristol–Myers Squibb Co.*, 973 F.2d at 1033).

77. Pl. Mem. at 12; *see also* 1/12 Tr. at 199–200 (statement of Robert Johnson). The Deal cannot seriously be arguing that Korangy

Publishing has infringed The Deal Marks by using the word "The," one of the most commonly used words in the English language.

78. 1/12 Tr. at 200–01 (statement of Robert Johnson).

79. In fact, both the title and subtitle ("New York Real Estate") for *The Real Deal* appear in small caps.

80. Def. Mem. at 16.

81. *Id.*

82. During the hearing, a witness for The Deal characterized *Crain's: New York Business* ("*Crain's*") as similar to *The Deal* in terms of

Deal presents no evidence tending to show that the purchasers of *The Deal*—primarily professionals who subscribe to the magazine—are likely to experience confusion due to the slight similarities. For the foregoing reasons, this factor tips slightly in favor of Korangy Publishing.

### c. Proximity of the Products and Likelihood the Plaintiff Will "Bridge the Gap"

■■■ "Th[ese] factor[s][are] concerned with the competitive distance between the products."[83] "When the two users of a mark are operating in completely different areas of commerce, consumers are less likely to assume that their similarly branded products come from the same source. In contrast, the closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source."[84] "In examining [the proximity] factor a court should compare all aspects of the products, including price, style, intended uses, target clientele, typical distribution channels, and others."[85] "Bridging the gap" refers to the likelihood that The

Deal will enter Korangy Publishing's market—namely focusing on New York real estate news.

■■■ The Deal has shown that there is considerable overlap between *The Deal* and *The Real Deal* in terms of target audience. There is also some overlap in content between the two publications, as *The Deal* occasionally prints stories about and runs ads relating to real estate.[86] However, there are clearly content-based differences between the two news magazines—*The Real Deal* is almost exclusively focused on real estate news relevant to the New York metropolitan area and *The Deal* broadly covers national financial and legal news, at times to the exclusion of real estate items. Moreover, on a per issue basis, *The Deal* costs nearly twice as much as *The Real Deal*[87] and the publications are distributed through entirely different channels. In light of the evidence, the proximity factor tips only slightly in The Deal's favor.

■■■ The Deal has effectively demonstrated that it is likely to "bridge the gap." The Deal employs a journalist whose focus is real estate.[88] Additionally, The Deal

---

advertising accounts. 1/9 Tr. at 51 (statement of Richard Siler). Coincidentally, I received a copy of *Crain's* in my chambers a few days later. *See Crain's,* Jan. 12–18, 2004. I note that *Crain's* bears a striking resemblance to both publications—it is the same approximate size of both *The Deal* and *The Real Deal,* it is printed on similarly glossy, colored paper, and, interestingly, its title appears in large black letters across the top of the magazine with a subtitle in bright red not unlike that displayed on the cover of both *The Deal* and *The Real Deal.*

83. *Arrow Fastener,* 59 F.3d at 396.

84. *Virgin Enters.,* 335 F.3d at 150.

85. *See Brockmeyer,* 2002 WL 1402320, at *10.

86. *See* 1/12 Tr. at 66–76 (statement of Kevin Worth) (describing various articles relating to

real estate); 1/9 Tr. at 26–34 (statement of Richard Siler) (describing various advertising accounts).

87. *See Brockmeyer,* 2002 WL 1402320, at *10. *The Real Deal* costs $3.00 per issue. A year-long subscription (44 issues) to *The Deal* costs $249, http://www.thedeal.com. The *Arrow Fastener* court held that customers were unlikely to be confused when both parties sold staplers in the same stores, but one party sold a pneumatic stapler and the other a lightweight small stapler. *See* 59 F.3d at 396 (explaining that there was a significant difference in price between the two staplers, and that they served different purposes and types of customers).

88. 1/12 Tr. at 66 (statement of Kevin Worth).

actively pursues real estate marketing accounts with real estate companies such as Cushman & Wakefield and Grubb & Ellis.[89] The Deal also pursues accounts with residential, as well as commercial, real estate clients.[90] Thus, it is likely that The Deal will enter the market for real estate publication market. Accordingly, this factor tips decidedly in The Deal's favor.

### d. The Existence of Actual Confusion

"It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion."[91] The Deal concedes that it has presented no evidence of actual confusion, having opted not to submit any survey evidence or testimony of customers tending to show actual confusion.[92] Accordingly, this factor is neutral.

### e. The Sophistication of Consumers

█ "This [ ] factor recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers."[93] "Where the purchasers of a products are highly trained professionals, they know the market and are less likely than untrained consumers to be misled or confused by the similarity of different marks."[94]

█ Members of the so-called "Deal Community" are highly sophisticated purchasers.[95] The Deal's CEO specifically described members of the "Deal Community" as "corporate executives, [such as] CFOs, CEOs, senior VP[s] of corporate development ... [,][a]dvisors, everyone from investment bankers to corporate lawyers, to mortgage brokers ... [,][a]nd institutional

89. *See* 1/9 Tr. at 23, 32, 44 (statement of Richard Siler).

90. *See id.* at 24 (statement of Richard Siler).

91. *Virgin Enters.*, 335 F.3d at 151.

92. Robert Johnson, The Deal's counsel, stated during the hearing:

> Q: Where is the proof of that, what readers are likely to believe?
> A: Your Honor, you're correct that we don't have any survey evidence, and I don't have any evidence specifically of actual confusion.
> Q: I know that .... but I don't know what evidence you have to support your statement.... I think that you believe it, which is interesting, but not evidence.
> A: I think it becomes the inescapable conclusion from examining actual copies of The Deal, the Daily Deal, and the Real Deal.
> 1/12 Tr. at 201.

93. *Arrow Fastener*, 59 F.3d at 396.

94. *Virgin Enters.*, 335 F.3d at 151. The Second Circuit has counseled that while "[s]ophistication of consumers usually militates against a finding of a likelihood of confusion," the sophistication of consumers may

not always be relied upon to prevent confusion. *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1228 (2d Cir.1987) (emphasis omitted), *abrogated on other grounds, Bristol–Myers Squibb Co.*, 973 F.2d at 1033. For instance, where the marks or products are *identical*, a consumer who is sophisticated may be no better off than the ordinary purchaser. *See id.* The sophisticated purchaser may even be *more confused* than the less sophisticated consumer by two products bearing identical marks, because she is more likely to conduct a thorough inspection of the products and discover the identical marks while her less careful counterpart might overlook the marks altogether. But where, as here, the products are readily distinguishable based on content and appearance, the sophistication of purchasers *decreases* the likelihood of confusion.

95. *See Morningside Group Ltd. v. Morningside Capital Group, LLC*, 182 F.3d 133, 142 (2d Cir.1999) ("[The customers] are a small circle of professionals, comprising investment bankers, private investors, accountants, attorneys and business owners and managers. They are often able to invest large sums of money and do so only after extensive research. Clearly they constitute a highly sophisticated market.") (quotation marks omitted).

investors." [96] Similarly, *The Real Deal* targets real estate professionals, boasting a demographic profile consisting of individuals who have earned graduate degrees and make annual salaries in excess of $140,000.[97] Additionally, by not making its publications available to the general public through newsstands, The Deal limits its readership to those in the "Deal Community." The sophistication of consumers decreases the likelihood of confusion because The Deal's publications differ from *The Real Deal* and THE DEAL MARKS are not identical to the title "The Real Deal". Accordingly, this factor militates in favor of Korangy Publishing.

#### f. Bad Faith and Quality of the Defendant's Products

■ These factors are not of "high relevance to the issue of likelihood of confusion. A finding that a party acted in bad faith can affect the court's choice of remedy or can tip the balance where questions are close." [98]

#### i. Bad Faith

■ "This factor examines whether defendants 'adopted [their] mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [their] and [plaintiff's] product.'" [99] In arguing that Korangy acted in bad faith, The Deal makes much of Korangy's

visit to its offices, concluding that Korangy's actions "unambiguously demonstrate [his] purposeful and knowing violation of The Deal's trademark rights[;][his] actions have no plausible innocent justification." [100] Korangy, however, does offer a plausible "innocent" justification—he testified that he contacted many magazines, including Crain Communications, Inc. and Newsweek, from whom he also received media kits.[101] He further explained that he went to these publications in order to "gain knowledge [ ] about how to do market research, about how to pitch advertising to potential advertisers for [his] magazines," and that he did not reveal that he was starting his own publication because he wanted to "get a genuine pitch" from Siler.[102]

The Deal also points out Korangy's failure to properly conduct a trademark search. While the failure to conduct a proper trademark search may be evidence of bad faith, it is not conclusive.[103] Although he was aware of THE DEAL MARKS, Korangy provides a reasonable explanation of how he "created" the title "The Real Deal"—he found it a catchy play on words descriptive of a real estate magazine.[104] Korangy Publishing further argues that "Korangy did his research and ... even went to the offices of The Deal to ensure that The Deal would not be an appropriate forum for Real Estate Advertising and confirmed what he believed to be true." [105] Because I find Korangy's tes-

---

96. 1/12 Tr. at 87 (statement of Kevin Worth).

97. *See* http://www.therealdeal.net/rates.php.

98. *Virgin Enters.*, 335 F.3d at 151–52; *see also Arrow Fastener*, 59 F.3d at 397–98.

99. *Streetwise Maps, Inc.*, 159 F.3d at 745 (quoting *Lang*, 949 F.2d at 583).

100. Pl. Mem. at 17.

101. 1/12 Tr. at 114 (statement of Amir Korangy).

102. *Id.*

103. *See Streetwise Maps*, 159 F.3d at 746 ("Defendants' failure to perform an official trademark search, even with the knowledge that plaintiff marketed its maps under the Streetwise name, does not standing alone prove that they acted in bad faith."); *Lang*, 949 F.2d at 583.

104. *See* 1/12 Tr. at 111 (statement of Amir Korangy).

105. Def. Mem. at 19. It is not altogether clear that Korangy's visit to The Deal's offices with the intent to discern whether it was an appropriate "forum for Real Estate Advertis-

timony credible and the burden is on plaintiff to demonstrate Korangy's bad faith, this factor tips slightly in Korangy Publishing's favor.

### ii. Quality of Defendant's Products

■ "This factor is primarily concerned with whether the inferior quality of a junior user's goods could jeopardize the senior user's reputation.... However, '[p]roducts of equal quality may [also] create confusion as to source.'"[106] The Deal concedes that it has presented no evidence tending to show that *The Real Deal* is an inferior publication as compared to *The Deal* and *The Daily Deal*.[107] Rather, relying on *Lois Sportswear*, The Deal argues that because the publications are of equal quality, there is an enhanced likelihood of confusion.[108] But *Lois Sportswear* presented a much easier case. At issue in *Lois Sportswear* were similarities in back-pocket stitching on jeans. There, the court found that similarities in quality could enhance the post-sale likelihood of confusion, when passers-by would see similar stitching on precisely the same products-jeans.[109] The instant action is easily distinguishable. Whereas two pairs of jeans may be interchangable to passers-by, it is far less likely that these two publications are so similar that their relatively equal quality would confuse the purchasing

public. Accordingly, this factor weighs in favor of Korangy Publishing.

### f. Balancing of the *Polaroid* Factors

■ As noted above, the grant of injunctive relief is an extraordinary remedy. The *Polaroid* factors are intended to guide the court in its evaluation of whether there is a likelihood that a *significant* number of consumers will be confused by the use of an allegedly infringing mark. At this early stage in the proceedings, most of the *Polaroid* factors favor Korangy Publishing. Accordingly, while The Deal may ultimately prevail on its claims, it has failed to demonstrate that a preliminary injunction should issue because it has not provided sufficient evidence that a significant number of consumers are likely to be misled as to the true source of *The Real Deal.*

### D. Irreparable Harm and Balance of Hardships

Because The Deal has not shown that a likelihood of confusion exists, "it cannot obtain a preliminary injunction without making an independent showing of likely irreparable harm."[110] The Deal has not presented any evidence that it will be irreparably harmed should a preliminary injunction fail to issue. To the contrary, The Deal did not immediately move for

---

ing" proves that Korangy acted in good faith. *First,* If Korangy were truly concerned about overlap between the two publications and the propriety of his use of "The Real Deal" in connection with a real estate publication, one would expect him to have contacted an attorney or requested a trademark search, rather than conducting what appears to have been a cursory Internet search and visiting the offices of a potential competitor. *Second,* to some degree, it undermines Korangy's "innocent" version of his visit to The Deal's offices because it implies that this was not like his visits to Crain Communications, Inc. or Newsweek. Rather, he went to The Deal with a purpose, which he concealed from Siler. Nonetheless, there is insufficient evidence in

the record to conclude that Korangy acted in bad faith, with the intent to get a "free ride" from The Deal's success.

106. *Savin,* 2003 WL 22451731, at *11 (quoting *Morningside Group Ltd.,* 182 F.3d at 142).

107. 1/12 Tr. at 208 (statement of Robert Johnson).

108. Pl. Mem. at 18 (citing *Lois Sportswear,* 799 F.2d at 867).

109. *See Lois Sportswear,* 799 F.2d at 872.

110. *Federal Express Corp. v. Federal Espresso Inc.,* 201 F.3d 168, 174 (2d Cir.2000).

injunctive relief, suggesting that it is unlikely to suffer irreparable harm in the absence of injunctive relief. Accordingly, it is unnecessary for this Court to consider whether The Deal has demonstrated a balance of hardships tipping in its favor, or a sufficiently serious question going to the merits.[111]

### E. Recall

As part of an injunctive order, courts may require a defendant in a trademark action to "withdraw the offending materials from all customers, retailers and other persons."[112] The Deal asks this Court for an order recalling all "objectionable" materials, withdrawing any advertisements bearing the mark, and distributing notices to subscribers disclaiming an affiliation between The Deal's publications and *The Real Deal.*[113] Because The Deal has failed to demonstrate the need for a preliminary injunction, The Deal's request for a recall order is also denied.

### III. CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction is denied in its entirety. The Clerk of the Court is directed to close this motion. A conference is scheduled for January 29, 2004, at 4:00 p.m.

---

**111.** On the other hand, Korangy Publishing's founder testified that it will be driven out of business if The Deal's motion for a preliminary injunction is granted. *See* 1/12 Tr. at 117 (statement of Amir Korangy).

**112.** *Perfect Fit Indus. Inc. v. Acme Quilting Co., Inc.,* 646 F.2d 800, 807 (2d Cir.1981).

**113.** Pl. Notice of Motion. Although The Deal requested this relief in its Notice of Motion, it failed to address this issue either during the hearing or in its memoranda of law. Similarly, Korangy Publishing did not address this point.